JOHN F. EPINA REALTY, INC. *v.* SPACE REALTY, INC. ET AL.
(11566)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

---

[1] See footnote 10, supra.

Argued April 4—decision released July 24, 1984

*E. Stanton Kennedy,* for the appellants-appellees (defendants).

*Marshall Goldberg,* with whom, on the brief, was *Howard C. Kaplan,* for the appellee-appellant (plaintiff).

ARTHUR H. HEALEY, J. The plaintiff, John F. Epina Realty, Inc. (Epina Realty), brought this action against the defendants Space Realty, Inc. (Space Realty), Tavern on the Rocks, Inc. (Tavern), and Lee Vanacore seeking damages in the form of commissions resulting from the sale and lease of certain real estate and the sale of a restaurant business which were located at 581 West Putnam Avenue in Greenwich. Vanacore was the sole stockholder and president of both Space Realty, which owned the land and the buildings thereon, and Tavern, which conducted a restaurant known as the Penthouse Restaurant. The restaurant was located at 581 West Putnam Avenue, and Tavern orally leased it from Space Realty. Tavern paid no rent to Space Realty under its lease. John F. Epina, president of Epina Realty and also a licensed real estate broker, met Vanacore in 1973 when he approached Vanacore and asked him for a listing of his real estate at 581 West Putnam Avenue. Thereafter, Vanacore gave the plaintiff several listings of the real estate and the restaurant business.[1] Pursuant to these listing agreements,

---

[1] The listing agreements between Vanacore and the plaintiff were characterized in the trial court's memorandum of decision as follows:

"*November 10, 1973* — an *open* listing to sell for $1,770,000 reserving the right to sell the premises by the owner or another broker with no termination date.

"*February 19, 1975* — an *open* listing to sell the property for $1,820,000 reserving the right to sell by the owner or another broker which terminated May 19, 1975.

"*June 2, 1975* — an *open* listing on the same terms and price which terminated December 31, 1975.

"*August 24, 1975* — an *exclusive* listing to sell the real estate for $1,750,000 which terminated August 24, 1976, but which also permitted the owner to sell without paying a commission.

"*February 3, 1976* — an *exclusive* right to lease the premises which terminated on March 3, 1976 which right was extended until May 4, 1976 and further to June 4, 1976.

"*May 5, 1976* — an exclusive right to *sell* the Penthouse Restaurant business for $450,000 which terminated November 5, 1976.

"*October 27, 1976* — a twenty-four hour listing agreement to sell the real estate at 579–581 West Putnam Avenue, Greenwich, for $1,800,000."

the plaintiff undertook to find persons who were interested in leasing and/or buying the subject properties. The plaintiff advertised the availability of the premises and brought a number of prospects to the premises.

In April or May of 1976, Vanacore admittedly "began conversations" with Robert Celona concerning the sale or lease of the restaurant business. This resulted in the execution on July 27, 1976, of a "collateral stock purchase agreement" between Celona, together with an associate John Lium, and Vanacore, whereby Vanacore transferred all of his stock in Tavern to Celona and Lium who in turn agreed to lease the premises on which the restaurant business conducted by Tavern was located. The lease agreement was also executed on July 27, 1976.[2]

The trial court, *Hon. William L. Tierney, Jr.*, state referee, determined that because of the listing agreements which the plaintiff had with Vanacore, the plaintiff had an "exclusive right to lease the premises up to June 4, 1976" as well as an "exclusive right to sell the Penthouse Restaurant business up to November 5, 1976." The trial court therefore found "that the defendant violated the terms of the agreement to lease by conducting negotiations with the lessees and entering into agreements with the lessees and by agreeing to a twenty year lease while plaintiff had an exclusive right to sell the business." The trial court also pointed out in its memorandum that at the time when "the exclusive agreement was entered into [the premises] had no binding lease imposed upon it which [the] defendant by his control of the corporation could not terminate, but

---

[2] The lease agreement provided for an annual rental payment of $54,000. The collateral stock purchase agreement stated that Vanacore was to receive "One ($1.00) Dollar and other valuable considerations . . ." for the transfer of his stock. There appears to be no dispute that Celona and Lium paid only one dollar for the Tavern stock.

it is obvious that few if any buyers would buy a business tied up to the lease of a third party for twenty-years."

The trial court then concluded that the plaintiff was entitled to a commission of 10 percent of the value of the business sold. It therefore awarded the plaintiff the sum of $40,400 based upon the appraisal made by Samuel Boyarsky that the value of the Penthouse Restaurant business was $404,000 which appraisal the court found to be "fair."

On appeal, the defendants claim that the trial court erred in: (1) its determination that the value of the Penthouse Restaurant business was $404,000 at the time of its sale; (2) excluding from evidence two state sales tax returns of Tavern for the fiscal quarters ending June 30, 1975, and December 31, 1975; and (3) concluding that the plaintiff was entitled to a commission under the listing agreements between the parties. On its cross appeal, the plaintiff claims that the trial court erred in: (1) not awarding it a commission for the lease of the premises; and (2) not finding the fair market value of the Penthouse Restaurant to be $654,000. We find no error on either the appeal or the cross appeal.

We turn first to the threshold issue of whether the plaintiff was entitled to any commission under its listing agreements with Vanacore. Here the defendants claim that the listing agreement of August 24, 1975, was properly characterized by the trial court as "an exclusive listing to sell the real estate for $1,750,000 which terminated August 24, 1976, but which also permitted the owner [defendants] to sell without paying a commission [to the plaintiff],"[3] and was "the basic and pervading agreement between the parties." Thus,

---

[3] There appears to be no dispute that the trial court properly determined that the defendants retained the right to sell the real estate without paying a commission to the plaintiff under the terms of the August 24, 1975 listing.

the defendants claim that the subsequent exclusive listing agreements of February 3, 1976, and May 5, 1976, to lease the premises and sell the restaurant, respectively, which the trial court interpreted to exclude the defendants' right so to lease or sell without paying a commission to the plaintiff, "were merely 'spin offs' which were in fact included within and bound by the terms of the August 24th [1975] agreement." Therefore, the defendants claim that they are not liable for any commission to the plaintiff for their sale and lease transaction with Celona and Lium because their listing agreement with the plaintiff was an exclusive agency listing which would reserve to them the right of sale or lease without payment of a commission to the plaintiff, and not an exclusive right to sell or lease listing which would not reserve to them such rights without liability for a commission.[4]

The challenge is not to the validity per se of the listing agreements here in question but, rather, to their interpretation. This issue primarily involves the three listing agreements between the parties dated August 24, 1975, February 3, 1976, and May 5, 1976.[5] Each of these agreements is a printed "form" contract which contains the basic terms and conditions to which the parties agreed. Blank spaces are provided for specifications such as the names of the parties, the descrip-

[4] In *Real Estate Listing Service, Inc.* v. *Real Estate Commission,* 179 Conn. 128, 132, 425 A.2d 581 (1979), we referred to the three basic types of listing agreements and described them as follows: "[T]he open listing, under which the property owner agrees to pay to the listing broker a commission if that broker effects the sale of the property but retains the right to sell the property himself as well as the right to procure the services of any other broker in the sale of the property; the exclusive agency listing, which is for a time certain and authorizes only one broker to sell the property but permits the property owner to sell the property himself without incurring a commission; . . . and the exclusive right to sell listing, under which the sale of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker." (Citations omitted.)

[5] See footnote 1, supra.

tion of the subject property, the period of time for which the agreement will be effective, and the commission rate. Appearing in bold print on the top of the August 24, 1975 agreement, to which the defendants claim the other listing agreements are subject, are the words "EXCLUSIVE AGENCY LISTING." Appearing on the top of the February 3, 1976 and May 5, 1976 listing agreements, respectively, are the words "EXCLUSIVE RIGHT TO LEASE" and "EXCLUSIVE RIGHT TO SELL."[6] The August 24, 1975 agreement also states that "[i]f the property is sold by anyone other than the owner(s) a commission will be due to the Agent. If the property is sold by the owner(s) to anyone other than people introduced to the property by the Agent, NO COMMISSION will be due." The February 3, 1976 agreement, in addition to the previously referred to "EXCLUSIVE RIGHT TO LEASE" language, expressly states that"[f]or the time, effort and expense incurred by the agent to LEASE the above property, the owner(s) agree(s) to give the agent the exclusive right to LEASE the property . . . ." The May 5, 1976 agreement contains a similar provision, the difference being that it provides for the "exclusive right to sell the business" rather than the "exclusive right to lease" the property. Unlike the August 24, 1975 agreement, however, these latter two agreements do not expressly contain or refer to any reservation by the owner to sell or lease the subject property without liability for a commission to the plaintiff.

The intention of the parties to a contract is to be determined by a fair and reasonable construction of the language used interpreted in light of the situation of

---

[6] The parties had also signed three other printed "form" listing agreements prior to the agreements referred to above. On the top of these agreements the words "OPEN LISTING AGREEMENT" appeared in bold print and each of these agreements specifically provided that "I/we reserve the right to sell the property myself/ourselves or through another broker or agent, in which event . . . you will be entitled to no commission."

the parties, the circumstances connected with the transaction, the motives of the parties and the purposes which they sought to accomplish. *E & F Construction Co.* v. *Rissil Construction Associates, Inc.,* 181 Conn. 317, 320, 435 A.2d 343 (1980); *Marcus* v. *Marcus,* 175 Conn. 138, 141, 394 A.2d 727 (1978). In the context of this case, the determination of what the parties intended in their listing agreements "is a question of the intention of the parties, and an inference of fact. As an inference of fact, it is not reversible unless the trial court could not reasonably have arrived at the conclusion it reached." (Citations omitted.) *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981). We point out in this regard that the trial court heard testimony from John Epina, without objection, that in entering into the February 3, 1976 and May 5, 1976 listing agreements, he explained to Vanacore the significance of the exclusive right to sell and lease language of the respective agreements regarding his liability for a commission and Vanacore understood the difference between their exclusive right to sale/lease agreements and their exclusive agency agreements. The trial court could properly credit this testimony in reaching its conclusion that the defendants acted in violation of their listing agreements with the plaintiff, thus entitling the plaintiff to a commission.

We further point out that it is significant that none of the three listing agreements in issue refers to any other one of these listing agreements so as to incorporate any of their terms or conditions. While such an incorporation in this case could have been accomplished by a reference in the February 3, 1976 and May 5, 1976 agreements to the August 24, 1975 agreement in a manner which would "establish that they intended to make the terms and conditions [the August 24, 1975 agreement] part of their understanding . . ."; *E & F*

*Construction Co.* v. *Rissil Construction Associates, Inc.,* supra, 319; *Randolph Construction Co.* v. *Kings East Corporation,* 165 Conn. 269, 275, 334 A.2d 464 (1973); *Batter Building Materials Co.* v. *Kirschner,* 142 Conn. 1, 7, 110 A.2d 464 (1954); this was not done. There is, therefore, no basis for the defendants' claim that this court must find that the parties intended that the February 3, 1976 and May 5, 1976 listing agreements were to be controlled by the terms and conditions of the August 24, 1975 listing agreement.

We next turn to the defendants' claims that the trial court erred in finding that the value of the restaurant business sold was $404,000. The defendants' argument here is twofold: (1) they claim that the appraisal of Boyarsky was based on "extremely minimal data" and that it did not consider certain relevant factors concerning the value of the business; and (2) that the trial court erred in excluding certain state sales tax returns which the defendants claim would have altered the valuation of the business. We reject both of these claims.[7]

We first address the trial court's exclusion of the state sales tax returns. The circumstances relating to this claim are as follows: The plaintiff had initially sought on December 19, 1980, the defendants' authorization to order copies of their tax returns from the Internal Revenue Service and the state of Connecticut for the years 1971 through 1976. Thereafter, apparently when full compliance had not been made, the plaintiff filed a request for production on September 24, 1981, of the defendants' federal income tax returns and state sales tax returns for 1974, 1975, and 1976.[8]

---

[7] We note that although the defendants have claimed in their brief that if a commission was found to be due to the plaintiff it should be based upon the amount expressed in the agreement of sale, i.e., $1, counsel for the defendants abandoned that claim at oral argument.

[8] Counsel for the plaintiff represented to us at oral argument that the plaintiff never received the authorization to order copies of the defendants' tax returns which it sought in December, 1980.

The defendants did not, however, produce, as the plaintiff had requested, the tax returns for the years 1975 and 1976.

On October 27, 1981, the plaintiff filed a motion for order of compliance which referred to the defendants' failure to produce the requested tax records for the years 1975 and 1976. The plaintiff requested an order of compliance and an order establishing the income of the Penthouse Restaurant to be not less than the 1974 income. The trial court, *Landau, J.,* entered an order on November 23, 1981, establishing the income of the restaurant for 1975 and 1976 as being not less than the income for 1974[9] pursuant to Practice Book § 231.[10] See *Chrysler Credit Corporation* v. *Fairfield Chrysler-Plymouth, Inc.,* 180 Conn. 223, 227, 429 A.2d 478 (1980).

More than four months after this order was entered and after the trial had begun, counsel for the defend-

[9] The restaurant's income for 1974 was $456,093.

[10] The order of *Landau, J.,* was the following: "The foregoing having been heard, it is hereby ordered: (1) Under § 231 of the Connecticut Practice Book, it is established that income for 1975 and 1976 is conclusively proven as NOT less than 1974."

Practice Book § 231, which is entitled "Order for Compliance; Failure to Answer or Comply with Order," provides in part: "If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Sec. 230A, or has failed to comply with the provisions of Sec. 232, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Secs. 222, 226, and 229, the court may, on motion, make such order as the ends of justice require.

"Such orders may include the following: . . .

"(c) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order . . . ."

ants, on April 1, 1982, brought to the trial court's attention for the first time the existence and availability of two quarterly state sales tax returns for the quarters ending June 30, 1975, and December 31, 1975.[11] After some discussion, the court stated that it would rule on the admissibility of the tax returns when the defendants offered them. One week later, the defendants offered the tax records into evidence, and the plaintiff objected based on Judge Landau's order of November 23, 1981, under Practice Book § 231. The trial court agreed with the plaintiff and excluded the records.

The defendants claim that in excluding the tax records from evidence the trial court abused its discretion. They argue that if the records had never become available, it might have been reasonable for the court to follow the November 23, 1981 order, but that since the records were actually available, it was "prejudicial error" to exclude them.[12] They also maintain that the plaintiff would not have been prejudiced by the admission of the records since Boyarsky's appraisal was based only upon a formula into which certain figures were placed. We are not persuaded by these arguments.

Before the trial court, when the records were offered, as well as before this court, defense counsel related the circumstances under which these records were ulti-

---

[11] Defense counsel first referred to those records in objecting to the plaintiff's "claim of proof" made during the examination of its appraisal witness, Boyarsky, that the trial court's previous ruling under Practice Book § 231 be "conclusive." Boyarsky testified that in making his appraisal of the restaurant business, he based the income of the business for 1975 and 1976 upon its income for 1974 consistent with the court's previous order. The plaintiff at that time made its "claim of proof." Defense counsel objected, pointing to the tax records.

[12] These records showed earnings of $49,821.30 and $52,422 for their respective quarters. The defendants claim that if this evidence was admitted, these quarterly figures could then have been projected as an annual income which would have been approximately $200,000 for calendar year 1975 and $210,000 for calendar year 1976, each of which is less than half of the figure used by the plaintiff's appraiser under the trial court's November 23, 1981 order under Practice Book § 231.

mately obtained.[13] While we do not doubt the accuracy of the circumstances relating to the discovery of these records, when viewed in the context of all of the proceedings in this case, including the pretrial discovery period, we cannot find that the trial court erred in not admitting the tax records.

We point out that the defendants have not challenged the propriety of the trial court's November 23, 1981 order. They make no claim at all that the trial court erred in issuing its order under Practice Book § 231, the clear implication of which is that the defendants had failed to respond properly to the plaintiff's request for production of the tax returns, thereby permitting the court, in the exercise of its discretion, to enter its order under Practice Book § 231 (c). Rather, the defendants would have us ignore their previous failure to respond properly to the plaintiff's discovery requests, made well in advance of trial, simply because of their claim that some subsequent effort made on their part on the eve of trial yielded some of the information initially sought by the plaintiff.

It is important to recognize that Practice Book § 231 is akin to federal rule 37. Both rules clearly provide for the imposition of sanctions on a party who, under certain circumstances, fails to act properly under the rules of discovery. Both permit a trial court to enter an order that the matters for which the discovery was

---

[13] Defense counsel pointed to his previous unsuccessful efforts to obtain from the state tax department the 1975 and 1976 tax records requested by the plaintiff. He also said that his office had earlier tried to get these records from the state tax department which "informed us that since these were sales tax returns prior to 1977, when they went on a computer, that they had been destroyed." Additionally, he said that the defendant Vanacore had been unable to produce these records. He then stated that on the day before trial he sent his associate to the state tax commissioner's office to make a further attempt to obtain the records. Defense counsel then stated that the tax commissioner himself dispatched an employee to look at some old records and out of those records, "two random copies of sales tax returns [of the restaurant] were discovered."

sought be taken as established for the purposes of the action. Practice Book § 231 (c); Fed. R. Civ. Proc., rule 37 (b) (2) (A).

As we have already stated, the defendants make no claim concerning the correctness of the trial court's November 23, 1981 order "[u]nder § 231 of the Connecticut Practice Book [that] it is established that income for 1975 and 1976 is conclusively proven as not less than 1974." They do not point to any claim made by them prior to the entering of the November 23, 1981 order by *Landau, J.,* which would have indicated that their failure to meet the plaintiff's requests was due to circumstances beyond their control. *Pavlinko* v. *Yale-New Haven Hospital,* 192 Conn. 138, 144–45, 470 A.2d 246 (1984); see *Societe Internationale Pour Participations Industrielles et Commerciales* v. *Rogers,* 357 U.S. 197, 78 S. Ct. 1087, 2 L. Ed. 2d 1255 (1958).[14] Rather, the defendants claim an abuse of discretion by the trial court, *Tierney, J.,* in not admitting this evidence despite the previous order of *Landau, J.,* because they did offer the evidence during the trial. "Final production [of the materials sought] is not determinative" and, therefore, this cannot absolve the defendants from their previous conduct which resulted ultimately in the court order of November 23, 1981. *Ohio* v. *Arthur Andersen & Co.,* 570 F.2d 1370, 1374 (10th Cir.), cert. denied, 439 U.S. 833, 99 S. Ct. 114, 58 L. Ed. 2d 129 (1978); see *Riverside Memorial Mausoleum, Inc.* v. *Sonnenblick-Goldman Corporation,* 80 F.R.D. 433 (E.D. Pa. 1978). In the circumstances presented in this case, we cannot find an abuse of discretion by the trial court in excluding the state tax returns.

Likewise, we find no error in the trial court's reliance on the appraisal of the value of the business made

---

[14] Additionally, an examination of the court file does not disclose that the defendants filed any objection to the plaintiff's motion for an order under Practice Book § 231.

by Boyarsky. While Boyarsky did refer in his testimony on cross-examination by defense counsel to various factors which he could have taken into account in his appraisal, he testified that his appraisal was based upon a formula which is used to determine the value of restaurant businesses based upon their gross income. This method and the calculations made were explained by Boyarsky at trial and the details of his appraisal are contained in his written appraisal which was admitted as a full exhibit. He stated that he made the "judgments [contained in the appraisal on the income figures available] and on [my] past experience using my evaluation method presented [in the] report."[15] Boyarsky also testified that he had viewed the business premises at various times and he expressed his opinion that it was situated in an "excellent location."

In determining the fair market value of the business, the trial court is vested with broad discretion. No one appraisal method is binding on the court and the court has the right to accept so much of the expert testimony and the recognized appraisal methods which are employed as it finds applicable. *Federated Department Stores, Inc.* v. *Board of Tax Review,* 162 Conn. 77, 86, 291 A.2d 715 (1971) and cases cited therein. "The exercise of this right would be reviewable only if it were apparent that the [trial court] misapplied or overlooked, or gave a wrong or improper effect to, any testimony or consideration which it [has a] duty to regard. *Stanley Works* v. *New Britain Redevelopment Agency,* 155 Conn. 86, 99, 230 A.2d 9 [1967]; *Bennett* v. *New Haven Redevelopment Agency,* 148 Conn. 513, 516, 172 A.2d 612 [1961]." Id. Moreover, the defendants have not pointed us to their performance of any appraisal of the business to rebut the appraisal evidence of the plaintiff. We cannot find error as claimed by the defendants in the trial court's valuation of the business.

[15] Boyarsky referred to his use on previous occasions of the appraisal method used in this case.

We now turn to the claims raised by the plaintiff on its cross appeal. First, we address its claim that the trial court erred in not finding the fair market value of the Penthouse Restaurant to be $654,000. The basis of this claim, which the plaintiff claims "sounds in estoppel," is that Vanacore had represented to the plaintiff on separate occasions that the gross annual sales figures for the restaurant were considerably more than they actually were and, therefore, the plaintiff should be entitled to a commission based upon the value of the business as represented by the defendants because it "performed extensive brokerage services and expended considerable funds in reliance upon the defendants' representations . . . ."[16]

As we have repeatedly stated, there are two elements which must be established in order to find an estoppel: one party must do or say something that is intended or calculated to induce another into believing in the existence of certain facts and to act upon that belief, and the other party must thereby actually change his position or do some act to his injury which he would otherwise not have done. *Papcun* v. *Papcun,* 181 Conn. 618, 621, 436 A.2d 282 (1980); *Remkiewicz* v. *Remkiewicz,* 180 Conn. 114, 119, 429 A.2d 833 (1980), and cases cited therein. Estoppel rests on the misleading conduct which results in prejudice to the other and absent such prejudice an estoppel cannot exist. *Remkiewicz* v. *Remkiewicz,* supra; see *Russo* v. *East Hartford,* 179 Conn. 250, 258, 425 A.2d 1282 (1979), cert. denied, 445 U.S. 940, 100 S. Ct. 1334, 63 L. Ed. 2d 773 (1980).

---

[16] The plaintiff arrives at the $654,000 figure based upon the gross sales figures for various periods given by the defendants which it claims were incorporated into its written brochures which it circulated in its efforts to sell the premises. At trial, Boyarsky, the plaintiff's appraiser, testified that if those sales figures were used in appraising the value of the business, its fair market value would be $654,000.

Even if we accept, as the plaintiff claims, that the defendants misrepresented their sales figures to the plaintiff, the plaintiff has not pointed to anything in the record which would have justified the trial court in concluding that it actually changed its position or did some act to its injury which it would not have otherwise done. Indeed, we point out that in the listing agreement, dated May 5, 1976, which gave the plaintiff the exclusive right to sell the business, it was expressly stated that the plaintiff would be entitled to a "10% commission if [the business was] sold at a price of $450,000, or at a price acceptable to the owner(s)." This clearly indicates that the plaintiff was willing to use its efforts and incur expenses for a commission that was substantially less than it now claims it is entitled to under its estoppel claim and strongly suggests that the defendants' misrepresentations did not induce the plaintiff to act to its injury. We therefore cannot conclude that the trial court erred in rejecting this claim of the plaintiff.

Finally, we address the second claim raised by the plaintiff on its cross appeal in which it asserts that the trial court erred in not finding that it was entitled to a commission for the defendants' lease of the premises.[17] Here the plaintiff points to the trial court's finding that the defendants "began conversations with Robert Celona concerning the sale or lease of the restaurant in April or early May 1976 which resulted in a lease between Celona and John Lium and [the] defendant and a collateral purchase of the stock in Tavern . . . [t]he final instruments [of which] were executed on July 27, 1976."[18] The plaintiff claims, relying on *Covino* v. *Pfeffer,* 160 Conn. 212, 276 A.2d 895

---

[17] Pursuant to the commission rate set out in the exclusive right to lease agreement and the annual rental of the premises of $54,000 received by the defendants, the plaintiff claims an additional commission of $32,400.

[18] There is no claim that the plaintiff introduced the eventual lessees, Lium and Celona, to the property.

(1970), that although the final instruments of this transaction were executed after its exclusive right to lease agreement had expired,[19] the negotiations which took place with these eventual lessees during the term of the exclusive right to lease agreement are sufficient acts on the part of the defendants to entitle the plaintiff to a commission under their agreement. The plaintiff's reliance on *Covino* is misplaced.

In *Covino,* the defendants had entered into a written exclusive right to sell agreement with the plaintiff for a term of ninety days. During the term of the agreement the defendants agreed to sell the subject property to a customer procured by one of the defendants or by a person other than the plaintiff. The sale of the property was "consummated by a conveyance . . ." after the expiration of the exclusive right to sell agreement. *Covino* v. *Pfeffer,* supra, 214. The *Covino* court then discussed the defendants' liability for a commission to the plaintiff as follows: "The owner in a contract giving a broker the exclusive sale of property agrees that he will not sell his property during the life of the contract to any purchaser not procured by the broker. *Harris* v. *McPherson,* 97 Conn. 164, 167, 115 A. 723 [1922]. The owner, in such a contract, makes the broker the only medium through which a purchaser can be procured during its life. *Harris* v. *McPherson,* supra, 167, 168. The owner agrees not only to exclude another agent, but also himself from procuring a purchaser. *Harris* v. *McPherson,* supra, 168. The broker is entitled to his commission as damages for the breach of an exclusive sale contract, if during the life of such a contract, the owner sells the property to a purchaser procured by his own efforts, or by other agents, or if the broker during such period produced a customer ready, able and willing to buy the property. *Harris* v. *McPherson,* supra, 171.

---

[19] The agreement initially was to terminate on March 3, 1976, but was extended until May 4, 1976, and finally to June 4, 1976.

"That the complaint does not allege that the plaintiff was the procuring cause of the sale is inconsequential. *Harris* v. *McPherson,* supra, 168, 171. That the complaint does not allege that the defendants and the purchaser entered into a specifically enforceable agreement of sale during the exclusive ninety-day period is also of no importance. *During the life of an exclusive sale contract, an agreement between the owner and the ultimate purchaser to sell and buy, whether or not specifically enforceable, gives rise to a cause of action on the part of an exclusive broker who uses reasonable efforts to sell the property."* (Emphasis added.) *Covino* v. *Pfeffer,* supra, 214–15.

We deem it clear from *Covino* that on the facts in this case, the plaintiff cannot recover a commission based upon its exclusive right to lease listing. There is no claim here that a lease or agreement to lease was in fact agreed upon during the term of the exclusive right to lease agreement; the plaintiff concedes that there were only negotiations during that time and the trial court so found. The plaintiff's right to a commission is controlled by the provisions of its contract with the defendants. *Nugent* v. *DelVecchio,* 36 Conn. Sup. 532, 535, 415 A.2d 1339 (1980), citing *Craig* v. *Margrave,* 84 Nev. 638, 641, 446 P.2d 653 (1968). In the absence of a provision in a contract precluding negotiations by the owner during the term of the exclusive listing, or some showing of bad faith or fraud, the plaintiff, who had no contact whatsoever with the eventual lessees, is not entitled to a commission upon the consummation of the lease after the expiration of the agreement.[20] See *Dunklee* v. *Shepherd,* 145 Colo. 197,

---

[20] We point out that the trial court's memorandum states that the defendants "violated the terms of the agreement to lease . . . ." It is quite clear, however, that it based its award of damages (commission) on the commission rate stated in the exclusive right to sell the business agreement, i.e., "10% commission on the value of the business sold . . . ." Although the exclusive right to lease agreement provided for a commission based upon

200–202, 358 P.2d 25 (1960); *Whitehurst* v. *Erstling,* 184 So. 2d 233, 234–35 (Fla. Dist. Ct. App. 1966); see generally annot., 27 A.L.R.2d 1348.

The plaintiff is therefore not entitled to a commission under the exclusive right to lease agreement.

There is no error on either the appeal or the cross appeal.

In this opinion the other judges concurred.

a formula by which the plaintiff would receive "5% – each of first 5 years' gross rent"; "3% – each of next 5 years' gross rent; and "2% – each gross years' rent from the 10th yr. thru balance and on renewals," no reference was made at all by the court to this commission rate but only to that rate contained in the exclusive right to sell agreement. Our reading of *Covino* v. *Pfeffer,* 160 Conn. 212, 276 A.2d 895 (1970), persuades us that the trial court was therefore correct in not awarding the damages claimed by the plaintiff under the exclusive right to lease listing.