[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, a licensed real estate broker, sues to recover a commission claimed to be due it by virtue of the sale of residential real estate formerly owned by the defendants at No. 311 Oxbow Road, Higganum. The property consists of a modern residential dwelling of 4400 square feet situated on a 2.1 acre lot. The complaint sounds in two counts: breach of contract and breach of the Connecticut Unfair Trade Practices Act, Sec. 42-110a
et seq., Conn. Gen. Stat. CT Page 6976
Following discussions which the plaintiff's representative had with the defendants, Robert and Susan Goodby, the parties, on July 29, 1992, entered into an exclusive listing agreement (Pl. exh. 3), the terms of which were fully explained to the Goodbys at the time of execution. A second listing agreement which, for the most part, contained the same terms was executed by the parties on September 8, 1992 (Pl. exh. 9). Its purpose was to give the property broader sales exposure by submitting it to the multiple listing service of the Shoreline Board of Realtors, Inc.
Pursuant to the terms of their agreement, the defendants gave to the plaintiff an exclusive right to sell the described realty for a period of six months, through the end of January 1993. The property was to be listed for sale at a price of $595,000, and the defendants were obligated to pay to the plaintiff a commission od [of] 6% of the selling price if either the plaintiff, the defendants, or anyone else during the term of the agreement found a buyer ready, able, and willing to buy the property at the list price or on terms acceptable to the sellers. The agreement also required the Goodbys to "refer all inquiries or offers concerning the listed property to [the plaintiff]."
The defendants, before contracting with the plaintiff, had without success exclusively listed the property with another agency over a period of several months. Following the anticipated sale of their home it was the defendants' intention to relocate and take up residence in Vermont.
Shortly after execution of the agreement (Pl. exh. 3) the plaintiff performed a market analysis in order to ascertain a realistic sale price for the property. Debra Ward, a broker employed by the plaintiff, notified the defendants that it was the plaintiff's belief, on the strength of its analysis, that the property could probably be sold at a price of $500,000 to $520,000. The defendants did not question the accuracy of the plaintiff's analysis.
The plaintiff vigorously pursued efforts to sell the property through the placement of a sign on the premises, advertisements in several newspapers as well as Connecticut Magazine, the preparation of a brochure targeted toward those whom it was felt could afford to pay a high purchase price, including physicians on the staff of Middlesex Hospital, and mailings to co-brokers in the multiple listing service to enlist their interest in making a sale. CT Page 6977
During the summer and fall seasons of 1992 the plaintiff's representatives actively marketed the property, showing it to a number of potential buyers. In late August one such prospect tendered an offer in writing to purchase the property for $500,000 (Pl. exh. 10). The offer was rejected by the defendants who in response submitted a counter offer of $560,000. The latter offer was not accepted.
Toward the end of 1992 relations between the parties deteriorated. The defendants did not wish the plaintiff's representatives to show the property unless they (the defendants) were present on the site, and they prohibited any showings at all during a two week period covering the Christmas holidays, despite the plaintiff's insistence that there were several interested parties to whom the property should be shown.
In December the defendants requested that the plaintiff reduce the amount of its commission. The request was based on the defendants' disclosure that they had personally found a prospect. The listing agreement was never revised to reflect circumstances which would be the basis for a reduced commission. In January the plaintiff requested that the term of the listing agreement be extended one week on the premise that a prospective buyer who had already seen the property on two occasions wished to see it again. The defendants refused to allow the property to be shown and rejected the request for an extension. It was at this juncture that Ward, after receiving information from two independent sources, inquired of the defendants whether they had sold their realty to Dr. and Mrs. McDowell. Ward testified that the defendants' response was that "it was none of [her] business." The same question was put to the defendant Mr. Goodby by Mark Toledo, plaintiff's agent, who had also been active in showing the property. Toledo testified that in January before the listing term ended he spoke by telephone with Goodby and inquired about a rumored sale of the property to the McDowells. The defendant, he said, became irate, refused to discuss the matter, and directed Toledo not to call him again.
Dr. Arthur McDowell is a cardiologist who is a member of Middlesex Cardiology Associates and on the staff of Middlesex Hospital. In the summer of 1992 he and his wife, who lived in Cromwell, began looking for another home to purchase or, in the alternative, an undeveloped lot on which would be constructed a new residential dwelling for their occupancy. CT Page 6978
Mrs. McDowell learned of the defendants' property being for sale in October through a friend who was also an acquaintance of the defendants. About a month later she and her husband were shown the house by the defendants who disclosed to them that the asking price was $595,000 and that the property was listed for sale with the plaintiff agency. Mrs. McDowell testified that from the outset she "loved the house" and was "interested in buying it," but that the price asked was more than she and her husband could afford to pay. They made no contact with the plaintiff, nor did the Goodbys request that they do so.
In December the McDowells viewed the house in the company of the Goodby's for a second time. Mrs. McDowell recalled that during their one to two hour visit her husband inquired when the listing agreement would expire and learned from Mr. Goodby that this would occur in late January. Some of the conversation at the meeting included the subject of purchase price, and whether there might be a reduction after the listing agreement term had ended. It was Dr. McDowell's testimony that at the meeting he "floated" a figure of "around $500,000" but received no response from the defendants. During this period a friendship developed between them, and the McDowells became social visitors to the defendants' home.
In late December the McDowells listed their home for sale with a real estate agency and applied for mortgage financing, identifying in the application the defendants' home as the property to be acquired. Meanwhile, their friendship with the defendants continued to blossom. In February the McDowells were dinner guests at the defendants' home, and the four also dined together at a Hartford restaurant. Although the listing agreement with the plaintiff had by then expired, the defendants, who still planned to move to Vermont, did not list the property with another agency.
On February 21, 1993, the McDowells entered into an agreement to sell their home to Dr. and Mrs. Stephen Franklin. Dr. Franklin is a cardiologist and an associate of Dr. McDowell. On the following day Mrs. McDowell wrote to the defendants to notify them that "Bud and I have just sold our house" (Def. exh. 1). The letter also expressed the McDowells' continued interest in the defendants' property.
On March 2, 1993, the McDowells wrote to the defendants ("since our circumstances have changed") offering to purchase their home for $505,000 (Def. exh. 2). A week later another letter was sent increasing their offer: "How about $515,000. . . ." (Pl. exh. CT Page 6979 15). On March 17, the defendants and the McDowells executed a formal "Sale and Purchase Agreement" (Pl. exh. 14), pursuant to which the McDowells paid a deposit of $51,500, agreeing to purchase the property, subject of mortgage financing, at a price of $515,000. The closing of title took place a few weeks later.
 I.
"The plaintiff's right to a commission is controlled by the provisions of its contract with the defendant." John F. EpinaRealty, Inc. v. Space Realty, Inc., 194 Conn. 71, 88 (1984). The evidence presented satisfies the court that the defendants breached their agreement with the plaintiff by not referring inquiries and at least one offer to buy which came from the McDowells during the term of the agreement. At no time did the defendants, as they were obligated to do, direct the McDowells to discuss any interest they had in acquiring the property with the plaintiff's representatives. Instead, the defendants, unknown to the plaintiff, had meetings with the McDowells on the site, showed the property, and discussed a sale price with them.
The significance of the breach is obvious. Had the defendants fulfilled the above requirement of the agreement, the plaintiff would most assuredly have become active, and probably exclusively so, in negotiations with the ultimate buyers long before the life of the listing agreement had expired. Even the absence of a formal offer to buy until after expiration would not in all likelihood have defeated the plaintiff's entitlement: "(5) We further agree that you shall be entitled to your commission if the property is sold by you or me, or any other person, within 30 days after the expiration of this agreement or any extension thereof, to any person with whom you have had negotiations prior to final expiration and about whom we have received written notification before or upon expiration of this agreement or of any extension" (Pl. exh. 9). The defendants' failure (or refusal) to refer the McDowells effectively deprived the plaintiff of the opportunity to perform services which would have generated a commission.
While the listing agreement does not preclude the defendants themselves from engaging in negotiations during its term, their success in finding a buyer ready, able, and willing to buy the property on acceptable terms will not deny the plaintiff its right to a commission (Pl. exh. 3 and 9). Moreover, whatever the extent of the negotiations conducted by the owner, those negotiations must not be motivated by bad faith or perpetration of a fraud upon the CT Page 6980 agent. Id.
"Bad faith in general implies . . . `a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Black's Law Dictionary (5th Ed. 1979).'" Habetz v.Condon, 224 Conn. 231, 237 (1992). While it is an indefinite term, bad faith contemplates a state of mind operating with some design or motive of self-interest which is inconsistent with the justified expectations of the other party. Wadia Enterprises, Inc. v.Hirschfeld, 27 Conn. App. 162, 169 (1992).
The fact that the McDowells expressed a willingness in December to pay $500,000 for the property suggests strongly that an understanding between sellers and buyers, who had become friends, regarding conveyance of title had been reached, and the defendants' testimony to the contrary is not credible. All that remained was a formalization of their understanding when the McDowells found a buyer for their own property. This they set about to accomplish, also in December, by placing the property on the market, engaging a real estate agent, and by applying for mortgage financing with regard to the property they had decided to purchase. Coincidentally, it was only a short time after the parties' listing agreement expired that a buyer of the McDowell property was found.
That such an understanding was reached is further bolstered by the defendants' curtailment of further efforts of the plaintiff to market and show the property during the late December-January period of the term, not to mention the complete refusal to discuss with Ward or Toledo the McDowells and their enthusiastic interest in purchasing the property. The absence of any evidence that the defendants did anything for more than six weeks, on their own or through a new agent, to sell the property following expiration of the listing agreement term strongly suggests that prior commitments had been made and a deal struck.
The motive of the defendants, who are intelligent adults, is plain. Most certainly they perceived that in order to net even $500,000 and at the same time fulfill their contractual obligation to the plaintiff, the property would have to produce a sale price of almost $530,000. They clearly wished to dispose of the property and move to Vermont (which they did following the sale), but despite the realty being on the market for an extended time, no offer to purchase had approached $530,000. Obviously, an early CT Page 6981 sale to the McDowells for $515,000 with avoidance of any commission payment presented to the Goodbys a prompt and rewarding solution to their problem.
The court finds that the defendants' arrangement with the McDowells smacks of bad faith and the fact that an enforceable agreement of sale was not executed until after expiration of the listing agreement term does not sanitize the result. "During the life of an exclusive sale contract, an agreement between the owner and the ultimate purchaser to sell and buy, whether or not specifically enforceable, gives rise to a cause of action on the part of an exclusive broker who uses reasonable efforts to sell the property. To place any other interpretation on the meaning of `sale' in an exclusive contract would encourage connivance."Covino v. Pfeffer, 160 Conn. 212, 215 (1970).
 II.
The court finds the Connecticut Unfair Trade Practices Act (CUTPA) inapplicable in the present context. The instant controversy concerns a one-time sale of real estate by individual defendants who were not in the business of making such sales. While a single act may serve as the basis of a CUTPA violation; seeDaddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 257-59
(1988); Hardy v. Griffin, 41 Conn. Sup. 283, 287 (1990); commonly the defendant is an entity or an individual engaged in a business activity which is at the heart of the complaint and the alleged violation. As Judge (now Justice) Katz observed, "[t]he issue is not whether the litigant is required to allege more than a single transaction in a professional or business context, but whether CUTPA applies to a single private transaction by a person not employed in the business of making such transactions." McCarthy v.Fingelly, 4 Conn. L. Rptr. 177, 178 (1991).
It is this court's conclusion that the thrust of CUTPA should not be applied "to a private, individual, one-time seller of [real estate] where that person is not in the business of selling [real estate]." Keeler v. Deuth, 3 CSCR 764 (1988). The present plaintiff is a business involved in real estate sales. Its claim is against the former private owners of the realty based on their one-time sale. The court agrees with Judge Corradino's reasoning: "It would be an odd interpretation of CUTPA to provide its remedies here to the only professional entity engaged in the transaction." Larson Skiba Associates, Inc. v. C C PackageStore, Inc., 10 Conn. L. Rptr. 441, 442 (1994). In the instant CT Page 6982 context the relief which CUTPA affords is inapposite.
 III.
Judgment may enter in favor of the plaintiff on the first count of its complaint to recover of the defendants damages of $30,900 plus costs. The court, absent agreement of the parties, will, at 9:30 A.M. on August 8, 1994, hear oral argument on the propriety of an award of attorneys fees and, if applicable, the amount thereof.
Judgment may enter in favor of the defendants on the second count of the complaint.
GAFFNEY, J.