[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is an appeal by the plaintiffs, First Fiscal Fund Corporation First Fiscal) and Lawrence Kadish, challenging the decision of the defendant, Town of Manchester Board of Tax Review, regarding the valuation of property known as 205 Spencer Street in the town of Manchester.
205 Spencer Street is commercial property commonly known as KMart Plaza. The land area is approximately 21.068 acres or 917,222 square feet. There are two buildings on the land. One building is the KMart store, which contains 97,834 square feet, plus a garden shop of 2,704 square feet. The second building contains an Edwards Supermarket of approximately 42,964 square feet plus ten satellite stores that have an additional 20,000 square feet of area.
Although KMart plaza is located in the town of Manchester, it is less than one mile from the East Hartford town line. Across the street from the subject property is a smaller sized retail center strip with another food market store.
KMart and Edwards have been tenants of the plaza since 1973 and 1975 respectively. KMart's lease expires in 1998. KMart has five additional five year options to renew its lease. Edwards lease expires in 1998. Edwards has five ten year options to renew its lease. These two leases favor the tenants with below market rents, and there is a reasonable expectation that the options would be exercised.
Both KMart's and Edward's leases contain escalation clauses with regard to adjustments throughout the initial term of the lease and the option periods. The leases also provide that the anchor tenants are responsible for utilities, taxes, insurance, and maintenance obligations. The leases generally provide for reimbursement to the owner for the tenants' pro rata share of various expenses including real property taxes.
The satellite store leases are negotiated on an individual basis. The terms of the leases vary but are generally from one to CT Page 2971 three years.
On the list of October 1, 1990, the town of Manchester revalued all of the property in the town of Manchester. As to the subject property, the assessor made the following assessment:
Land $2,568,650
Building 3,470,040
 Outbuilding 221,830 ---------- Total Assessment $6,260,520
At 70% of value for assessment purposes, the fair market value of the property, as determined by the assessor, was $8,943,600.
First Fiscal appealed to the board of tax review. Following the hearing, the board reduced the land value of the subject property to $2,054,920. The total assessment was reduced, therefore, to $5,746,790. With property assessed at 70% of value, this amounted to a fair market value of $8,209,700.
This tax appeal was taken from the board of tax review's action covering the grand lists of October 1, 1990, October 1, 1991, October 1, 1992, and October 1, 1993. The defendant town, in its answer to the plaintiff's complaint, denies that First Fiscal had an interest in the property, and therefore, was not entitled to maintain this appeal. Prior to trial, the plaintiff's motion to add Lawrence Kadish as a party plaintiff was granted. The defendant thereafter denied allegations in the plaintiffs' amended appeal that Lawrence Kadish had an ownership interest in the property.
There are two issues in this appeal. The first issue is whether First Fiscal and Lawrence Kadish have standing to maintain this appeal. The second issue is the fair market value of the subject property on the revaluation date of October 1, 1990.
General Statutes § 12-111, entitled "Appeals to Board of Tax Review," provides in part: "At such meeting any person, including any lessee of personal property . . . and any person to whom title to such property has been transferred since the assessment date, claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to such board of tax review." CT Page 2972
The chain of title to the property appears to be as follows: Goodrich Realty Group of Connecticut Ltd. conveyed the property to First Fiscal by deed dated November 8, 1971, and recorded November 13, 1972. First Fiscal conveyed varying interests totalling 100% in the subject property to ten investors. The conveyances by First Fiscal to the original ten investors were by warranty deeds dated November 17, 1972, and recorded one year later on November 8, 1973. Several deeds to investors recited that they were subject to a mortgage to Lawrence Kadish dated November 17, 1972, for $5,300,000. The chain of title further reflects that the 10% interest of L.S. Williams was conveyed to Lawrence Kadish by warranty deed dated January 11, 1984, and recorded May 28, 1993.
Lawrence Kadish, by virtue of the conveyance of the 10% interest in the subject property dated January 11, 1984, had an interest in the property for the purposes of standing to challenge the tax appeal taken by First Fiscal on the list of October 1, 1990. Although Kadish's deed was recorded on May 28, 1993, delivery was made to Lawrence Kadish on the date of execution on January 11, 1984.
In considering the evidence, we find that there was a management contract between First Fiscal, as the manager of the property, and the individual investors. Lawrence Kadish was the principal shareholder and president of First Fiscal as well as a property owner. In reality, it was Lawrence Kadish who managed the subject premises under the aegis of First Fiscal. The assessor for the town of Manchester acknowledged that First Fiscal had an interest in the property by virtue of its records showing First Fiscal and others as having an interest in the subject property. The assessor looked to First Fiscal for payment of taxes and payment was made by First Fiscal. The town of Manchester is charged by General Statutes § 12-64(a)[1] to list property for tax purposes in the name or names of the taxpayers who hold record title to that property.
Under the doctrine of estoppel, a municipality cannot list a person or entity as a taxpayer, accept the payment of taxes by that person or entity, allow this same party to appear before the board of tax appeals to contest the assessment, and based upon this appearance reduce the assessment, and subsequently deny this same taxpayer the right to contest the assessment placed upon its property. See Resnik v. City of New Haven, 12 Conn. Sup. 47, 50
(1943). By billing First Fiscal and accepting the payment of those CT Page 2973 tax bills by First Fiscal, the town of Manchester is estopped from claiming that First Fiscal is not an aggrieved party pursuant to §12-111. See, e.g., Pepe v. New Britain, 203 Conn. 281, 293-94,524 A.2d 629 (1987). Cf. Schwarzschild v. Martin, 191 Conn. 316, 321,464 A.2d 774 (1983).[2]
We conclude that First Fiscal and Lawrence Kadish have standing to maintain this tax appeal.
The second issue in this case is the determination of the fair market value of the subject property as of the revaluation date of October 1, 1990.
Both Robert Stewart, the plaintiffs' appraiser, and Christopher Buckley, the town's appraiser, concluded that the highest and best use of the subject property on October 1, 1990, was for its present use as a neighborhood shopping center. We concur. Both appraisers, in considering the value of the subject property, used the cost approach, income capitalization approach and the market sales approach. However, both appraisers considered the income approach to be determinative of value. Both appraisers arrived at the same overall capitalization rate under their income analyses of 10.67%.
After reconciling the three approaches to value, Buckley, the town's appraiser, valued the subject property as of October 1, 1990, at $7,600,000. This valuation is approximately $610,000 lower than the assessor's determination as of the same date. Stewart, the plaintiffs' appraiser, valued the fee simple estate of the subject property at $5,750,000 as of October 1, 1990, and valued the leased fee estate at $4,200,000.
In using the income capitalization approach, Buckley did not have available for review the current leases for the subject property. For this reason, Buckley used market rental rates in analyzing the income capitalization approach. Buckley analyzed the location, competition, market conditions, functional utility, physical condition, and amenities/services provided by the owner and concluded that the market rental rate for the KMart space was $4.00 per square foot while the market rental rate for the Edwards space was $6.00 per square foot as of October 1, 1990. Buckley further concluded that the satellite retail space in the shopping center was valued at $12.00 per square foot. These rates were based on a triple net and did not include reimbursement for common area expenses. Based on the square footage of KMart, Edwards and CT Page 2974 the satellite stores, Buckley concluded that the total gross income was $880,374. Buckley selected a vacancy rate and collection loss of 5%, which amounted to $44,019 resulting in an effective gross income of $836,355. Buckley determined the market operating expenses of the subject property, based on his familiarity with shopping centers throughout the state of Connecticut at $42,557.
Deducting the total operating expenses of $42,557 from the effective gross income of $836,355, the net operating income of the subject property, according to Buckley, was $793,798. The net operating income of $793,798 capitalized by the rate of 10.67% resulted in a value of $7,439,534. Buckley rounded this value off to $7,450,000 as the value of the subject property using the income capitalization approach.
Stewart, in valuing the fee simple estate using the income capitalization approach, considered the market rental for the KMart space to be $3.75 per square foot. Stewart also determined that the market rent for Edwards was $4.50 per square foot and $9.00 per square foot for the satellite retail spaces. Using the market rentals for the various spaces, the appraiser developed the total gross potential income of $729,131. To this, Stewart deducted a 7.5% vacancy and collection loss resulting in an effective gross income of $674,446. Stewart factored in a management collection fee of 6%, or $40,467, plus a common area maintenance fee for vacant spaces of $20,000. These additional expenses totalled $60,467, which resulted in a net operating income of $613,979. Stewart divided the $613,979 by the capitalization rate of 10.67 to arrive at a value of $5,754,255 rounded out to $5,750,000.
Stewart next went on to value the subject property on the income capitalization approach using a leased fee estate concept.
 A leased fee estate is an ownership interest held by a landlord with the right of use and occupancy conveyed by lease to others; the rights of lessor (the leased fee owner) and leased fee are specified by contract terms contained within the lease.
Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992) p. 123.
In determining the value of real estate, there is essentially no difference between the leased fee estate and fee simple estate.Grossomanides v. Wethersfield, 33 Conn. App. 511, 513-15, CT Page 2975636 A.2d 867 (1994). The distinction between the market rent approach and the leased fee approach is that in the market rent approach the appraiser uses prices determined through present market forces, whereas in the leased fee estate, the appraiser uses the existing contract rents, which produce a certain stream of income over a long period of time. See The Appraisal of Real Estate, supra, p. 420. Under the leased fee concept, it makes no difference what the market rents are at any fixed period of time since the landlord/property owner cannot vary the income flow of the property because of the fixed nature of the income from the long term leases. See Somers v. Meriden, 119 Conn. 5, 8-9, 174 A. 184
(1934). Under these circumstances, Stewart found it appropriate to use the income stream provided by both KMart and Edwards since both leases, which produced the income, were long term leases as of October 1, 1990. An investor purchasing the subject property could not upgrade the anchor tenants with tenants paying market rent but rather would be purchasing the existing rent stream of the two anchor tenants. See id. Stewart analyzed the leases of the two major tenants and concluded that the annual rental income from the lease of the KMart space as of October 1, 1990, was $232,000 or $2.39 per square foot. The basic rent of $2.39 will remain the same through all of the option periods. The Edwards lease produced $137,500 in annual rent, which equates to $3.34 per square foot. This basic rent will remain the same through all of the option periods.
Stewart utilized the leases produced by the existing small tenants and entered the value of the vacant space at $9.90 per square foot, arriving at a gross potential income of $567,787. Stewart deducted a 33% vacancy rate for the satellite portion of the property, which amounted to $65,435, to arrive at effective gross income of $502,352. Stewart determined that the management fee under this concept at 3% of collections plus insurance, parking lot, lighting, repairs and maintenance, and the common area maintenance for vacant space totalled $90,221. This left a net operating income of $412,131. Dividing the capitalization rate of 10.67% by the effective gross income of $412,131, Stewart determined the value of the leased fee estate to be $4,120,000.
We agree with both appraisers that the more accurate method of valuation for commercial rental property is the income approach. General Statutes § 12-63b authorizes the assessor to evaluate the present true and actual value of rental income real property utilizing, among other methods, the capitalization of net income based upon market rent for a similar property. CT Page 2976
The concept of value for tax assessment purposes is "fair market value." This is a price that would probably result from fair negotiations between a willing seller and a willing buyer.Xerox Corp. v. Board of Tax Review of City of Hartford, 175 Conn. 301,304-05, 397 A.2d 1367 (1978). The town argues that only market rents are the appropriate measure of the value of the subject property. Section 12-63b(b) further defines the term "market rent." This section provides that market rent is:
 the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination.
"Thus, the statute requires that, in determining a property's `market rent,' the assessor and, therefore, the court, in determining the fair market value of the property, must considerboth (1) net rent for comparable properties, and (2) the net rent derived from any existing leases on the property. This legislative approach makes sense because it reflects the reality that a willing seller and a willing buyer — whose judgments are what we mean by `fair market value' — would themselves consider in arriving at a price for the property that is subject to leases that do not closely approximate current rentals for similar properties." FirstBethel Associates v. Bethel, 231 Conn. 731, 740, 651 A.2d 1279
(1995).
In the context of the subject property, a willing buyer has to accept the fact that the two anchor tenants that comprise the major portion of the rental income, are long term leases which provide for below market rent. As the plaintiffs point out, a long term below market lease has a chilling effect on potential buyers.Missouri Baptist Children's Home v. State Tax Commission ofMissouri, 867 S.W.2d 510, 513 (Mo. Banc 1993). The court inMissouri Baptist notes that considering potential market rents rather than actual rents hypothesizes an unrealistic market. Id.
The chilling effect on the subject property can be shown by the efforts of Lawrence Kadish in attempting to sell the subject property. Kadish actively offered the subject property for sale for the asking price of $5,000,000 prior to the revaluation date of CT Page 2977 October 1, 1990. Two offers of $4,700,000 and $4,350,000 were submitted by purchasers prior to the revaluation date. Although Kadish said that the offers were accepted, the buyers withdrew their offers without explanation. The subject property did ultimately sell on May 20, 1994, for $4,178,680.
"A trial court is vested with broad discretion in municipal tax appeals to determine true and actual value, and `has the right to accept so much of the expert testimony and the recognized appraisal methods which are employed as it finds applicable.'" First BethelAssociates v. Bethel, supra, 231 Conn. 741, quoting John F. EpinaRealty. Inc. v. Space Realty. Inc., 194 Conn. 71, 84, 480 A.2d 499
(1984).
We find it appropriate in this case to use the actual rents for the long term leases, the anchor stores, and market rents for the short term leases, the satellite stores, at the rate of twelve dollars per square foot as determined by Buckley. We also find it appropriate to use the 5% vacancy and collection rate and the expense figure utilized by Buckley.
Using these figures under income capitalization approach, we compute the fair market value of the subject property as follows:
Income
Fixed rent from Kmart/year — — — — — — — — $ 232,000
Fixed rent from Edwards/year — — — — — — — 137,500
 Market rent from satellite stores 20,000 square feet at $12.00 per square foot based upon the town's appraisal report less a 5% vacancy and collection cost — — — — — — — — — 228,000 ----------- Effective gross income $ 597,500Expenses
 As determined by the town's appraisal — — 42,557 ----------- Net operating income — — — — — — — — — — — — $ 554,943
 Using the capitalization rate selected by both appraisers, of 0.1067, the value is — — — — — — — — — — — — — — $ 5,200,965
CT Page 2978
Accordingly, we find that the fair market value of the subject property on October 1, 1990, was $5,200,965.
The assessor is ordered to reduce the fair market value of the property to $5,200,965 on the grand list of October 1, 1990, October 1, 1991, October 1, 1992, and October 1, 1993, and to assess such property at 70% of its fair market value. This judgment shall enter without costs to either party.
Arnold W. Aronson Judge of the Superior Court