**In re BOARDWALK MARKETPLACE SECURITIES LITIGATION.**

MDL No. 712 (WWE).

United States District Court,
D. Connecticut.

Sept. 14, 1987.

John A. Cvarch, Shipman & Goodwin, Hartford, Conn., for defendant Forbco Management Corp.

James G. Greene, Jr., Pepe & Hazard, Hartford, Conn., for defendants Arthur and Donna Minardi.

Frederick U. Conrad, Jr., Shipman & Goodwin, Hartford, Conn., for defendant William H. Horton.

Stephen P. Hoffman, Pomerantz Levy Haudek Block & Grossman, New York City, for plaintiffs David Bossy and Richard W. Lazaro.

Bennett H. Last, Gilbride, Tusa, Last & Spellane, New York City, for plaintiff Public Loan Co., Inc.

Ann M. Siczewicz, Walter E. Paulekas, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for plaintiff Home Bank and Trust Co.

David G. Hetzel, Hebb & Gitlin, Hartford, Conn., for plaintiff BarclaysAmerican/Business Credit, Inc.

John W. Cannavino, Timothy G. Ronan, Cummings & Lockwood, Stamford, Conn. and William A. Harvey, John Spelman, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa., for defendant Syracuse Sav. Bank.

David W. Schneider, Tyler Cooper & Alcorn, New Haven, Conn., for defendant Binghamton Sav. Bank.

## INTERLOCUTORY RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

EGINTON, District Judge.

This complex litigation arises from the formation and demise of nine limited partnerships organized to redevelop property in Atlantic City, New Jersey. Investors who purchased partnership interests sought tax benefits from their investments. To finance their purchases, the investors executed promissory notes payable to American Funding Limited. With the collapse of the redevelopment scheme, many of the investors ceased making payments on their notes which had been purchased from American Funding by various banks. The investors claim that they were defrauded in the promotion and sale of partnership interests, but the banks, seeking collection on the notes, assert that they are holders in due course and accordingly are immune from most of the defenses raised by the investors.

On February 18, 1987 the Judicial Panel on Multidistrict Litigation transferred to this district many of the cases arising from this scheme. Jurisdiction in these cases is based on diversity. To date, their number exceeds 300 and is increasing. Most of the actions are suits initiated by banks against defaulting investors. Some were initiated by investors suing the promoters, their professional advisors (lawyers and accountants) and the banks.

A threshold issue is whether the banks as purchasers of the investors' notes are holders in due course. Central to that issue is the determination of whether the notes are negotiable instruments. The investors, whether aligned as plaintiffs or defendants, have moved for "partial summary judgment" asserting that the notes are not negotiable. Though the banks argue that the notes are negotiable, they

first argue that the issue is improperly raised on a motion for summary judgment.

The dispute is governed by Connecticut law pursuant to the parties' valid agreement. Appendix A, paragraph 13. In interpreting the Uniform Commercial Code ("Code"), Connecticut courts frequently rely on reasoning set forth in decisions from other jurisdictions.

## I

## PROCEDURAL POSTURE

The banks argue that the federal rule pertaining to summary judgment should be interpreted in a restrictive fashion, but that Article Three of the Code should be read in a more liberal way. Thus, they argue that Fed.R.Civ.P. 56 should be rigidly construed so as to prevent consideration of the investors' motions at this stage in the proceedings, but, on the merits, the rules in the Code which govern negotiability should be given a broad construction that would support the negotiability of the notes.

The crux of the banks' argument that the court should not consider the investors' motions styled as motions for "partial summary judgment" appears to be that any ruling on negotiability would not be a "judgment" in the sense that no appeal could be taken, or alternatively, that Rule 56(d) which allows for interlocutory summary judgments does not authorize summary judgment on only a portion of a claim.

■ These motions can be considered under Rule 56. There are no material issues of fact in dispute. The negotiability of a note is to be determined from its face, and the parties agree that all of the investors signed notes identical to those submitted with the moving papers and attached as appendix A to this ruling. *See, e.g.,* Conn. Gen.Stat. Section 42a–3–109 comment 2 (1987);[1] *Calfo v. D.C. Stewart Co.,* 717 P.2d 697, 700 (Utah 1986). These are the same notes purchased by the banks. Not only are the material facts agreed upon,

---

1. Hereinafter, references to the Uniform Commercial Code as adopted in Connecticut shall be to section number. The Connecticut codification retains the Code's numbering scheme.

but no additional facts can be adduced to alter the negotiability analysis.

The banks rely on *Dexler v. Carlin,* No. H 83–333 (MJB), slip op. (D.Conn. Mar. 20, 1986). In that case a handicapped plaintiff sued the United States Postal Service, alleging that its failure to hire him violated the Rehabilitation Act of 1973. One defense on which the defendant sought partial summary judgment was that the Act did not require the defendant to consider the plaintiff for any other position than the one for which he applied. Judge Blumenfeld noted that:

> Granting summary judgment on this issue would not dispose of any claim in the case. The plaintiff's claim is that the defendant failed to make reasonable accommodations for his handicap. That claim encompasses far more than the theory that the defendant should have considered him for other positions, *and will remain in the case whether or not this motion is granted.*

*Id.* at 4 (emphasis added). Judge Blumenfeld went on, however, to decide the question under Rule 56(d), thereby narrowing the issues for trial.

It does not appear that "claim" as it is used in *Dexler* means a cause of action. The argument that the defendant failed to consider the plaintiff for other positions was only one theory under which the plaintiff was pursuing his reasonable accommodation claim under the Act, a claim which would survive regardless of the demise of one theory.

The banks are also not helped by the reasoning in *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506 (N.D.Ill. 1985). The court was confronted with a motion for partial summary judgment on just that portion of one count in an age discrimination action demanding damages. It concluded that Rule 56 allows for granting only appealable judgments, and that Rule 56(d) was not an available alternative basis for rendering a decision because it

could be the basis only of a motion ancillary to a full fledged motion for summary judgment. *Id.* at 509 ("There is no such thing as an independent motion under rule 56(d).").

In this case, a negative determination on negotiability would completely dispose of the banks' claim to holder in due course status. Indeed, a negative ruling on this threshold question could forestall countless hours and dollars being expended in discovery that would proceed on the assumption that the banks are holders in due course. If the investors are correct, the entire focus of this litigation would change, speeding its resolution and avoiding wasteful discovery.

Regardless of the resolution of the motions, an appealable ruling will not result. Therefore, "partial summary judgment" is an unfortunate label. *See* Wright, Miller and Kane, *Federal Practice and Procedure* 463–4 (2d ed. 1983). It may well be, as the commentators suggest, that partial summary "adjudication" is a more accurate phrase.

A motion brought under Rule 56(a) or Rule 56(b) which either improperly seeks a final judgment on that which perforce cannot be final or which the court determines should fail on the merits can nevertheless be handled pursuant to Rule 56(d). It is this situation which the *Arado* court did not fully consider. *Compare Driver v. F.A. Mitchell Co.,* 35 F.R.D. 226 (E.D.Pa. 1964). This is the route which Judge Blumenfeld implicitly took in *Dexler, supra,* and which this court will follow.

"Holder in due course" status under the Code, Section 3–302, involves relatively specific factual invariants of which a note's negotiability, Section 3–104, is the most important.[2] The negotiability issue is fully briefed and ripe for decision. Depending upon how the court rules on the question, it may serve to limit the issues at trial. Fed. R.Civ.P. 56(d). Any doubt about the propriety of reading Rule 56 in this manner is

---

**2.** "Since one can be a 'holder in due course' only of a negotiable instrument, the question whether an instrument is 'negotiable' becomes most acute when one is trying to determine whether a party is a 'holder in due course' who cuts off prior claims and defenses." J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 487 (2d ed. 1980).

resolved by reference to the general admonition that the federal rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.

## II

## NEGOTIABILITY

Under the Code, a holder in due course is one who takes an instrument for value, in good faith and without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. Section 3–302. Throughout Article Three, "instrument" means negotiable instrument. Section 3–102(1)(e). To be negotiable, an instrument:

must (a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and (c) be payable on demand or at a definite time; and (d) be payable to order or bearer.

Section 3–104(1).

The sole focus of the investors' challenge to the negotiability of these notes is Section 3–104(1)(c). The notes are relatively simple. *See* Appendix A. The relevant portions read as follows:

3. PAYMENTS

I will pay _____ monthly installments of Principal and interest, each in the amount of $_____, commencing on the _____ day of _____ 19____e

In the event I purchased Credit Life Insurance, the premium is included in the monthly installment.

e—estimated first payment date.

. . . .

5. PAYMENT DUE DATE.

Lender will notify me in writing of the first payment due date, the amount of the first payment, the date of the first payment, the date of the final payment and the amount of the final payment. Interest shall not begin to be due to the Lender until the date of the notice to me, the first payment due date shall not be earlier than 30 days from the date of the notice to me.

I will begin making payments on the date set forth in the notice from the Lender to me, and continue to pay on the same day of each month until I have paid all the principal and interest and any other charges, described below, that I may owe under this Note.

If on the final payment due date as provided to me by the Lender in its notice, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.

I will make my monthly payments at the office of the Lender, 7 Lincoln Avenue, Greenwich, Connecticut 06830 or at a different place if required by the Note Holder.

In the blanks in paragraph 3 of each note are handwritten figures representing the number of monthly payments, the amount of each payment, and an estimated date on which the payments are to begin.

The investors pose a narrow challenge to the notes' claimed negotiability, alleging that in contravention of Section 3–104(1)(c) they are neither payable on demand nor at a definite time. The Code defines "on demand" in Section 3–108, and "definite time" in Section 3–109. The initial question is whether these notes are payable at a "definite time."

## A

## DEFINITE TIME

The Code states a note is payable at a definite time if it is payable:

(1) ... (a) on or before a fixed date or at a fixed period after a stated date; or (b) at a fixed period after sight; or (c) at a definite time subject to any acceleration; or (d) at a definite time subject to extension at the option of the holder, or to extension to a further definite time at the option of the maker of acceptor or automatically upon or after a specified act or event.

(2) An instrument which by its terms is otherwise payable only upon an act or event uncertain as to time or occurrence

is not payable at a definite time even though the act or event has occurred. Section 3–109.

These notes are negotiable if their payment date provisions satisfy one of the four types of "definiteness" set out in subparagraph 1 of Section 3–109 and steer clear of the pitfalls in subparagraph 2 of the same section. Finally, if the notes fail to state a definite time for repayment, they are negotiable only if they can be construed as demand notes. Sections 3–104(1)(c) and 3–108.

The investors' argument proceeds along both parts of Section 3–109. They argue that the notes on their face do not contain a payment date which satisfies any of the four aspects of Code definiteness, and that paragraph 5 in the notes describes an "event uncertain as to time or occurrence" (notice from the lender to the maker of a date on which the first payment will be due) which destroys negotiability.

■ In a brief filed by Arthur and Donna Minardi, the investors make a grammatical and lexicographic argument that the notes cannot contain a "definite" time if the handwritten date on each note is clearly marked as an "estimate;" definite simply does not mean estimated. As is clear from the Code's variegated definition of what constitutes a definite time, the Code's "definite" is by no means a direct antonym for "estimated." Clearly, the Code use of "definite" does not mean what it may appear to mean to the layman.[3] By any construction of definite time, however, these notes do not contain a definite payment date.

The "e" notation, meaning estimated date, which follows the blank reserved for the first payment date in paragraph 3 of the notes, modifies whatever handwritten date fills the blank. *See* Appendix A. Any handwritten date will not be contradicted by the "e" notation or nullified by it. The "e" notation is meaningless unless and until a date has been filled in to complete the blank. Paragraph 3 requires that the mak-

er pay a fixed sum in a fixed number of installments to begin on an estimated date. The entire paragraph is logically read in this manner. One must look to paragraph 5 to learn more about how the payment date is determined.

Paragraph 5 provides that the first payment date shall be the date set out in a notice which the lender is to provide the maker. No payments are due until at least 30 days following the noticed date. Nowhere in the note is there any indication of when the noticed date will be. From the face of the notes, it is impossible to determine when the payment dates will be. Nonetheless, the language of paragraphs 3 and 5 of the notes does not present the type of uncertainty that activates Section 3–118 of the Code, which provides limited rules of construction for ambiguous terms in negotiable instruments.

**1.**

### Sections 3–109(1)(a), (b)

The notes do not satisfy the requirements of definite time under either of these subsections. Subsection (a) reads "on or before a stated date or at a fixed period after a stated date." Logically, a note containing an estimated first payment date and a provision which states that the lender will notify the maker of the actual first payment date does not fall within the confines of this subsection. If the estimated first payment date, for example, were January 3, 1986 (as it is in the David and Deborah Bossy note), the lender can notice a first payment date of January 2d or 4th. Nothing requires that the date fall before the estimated date or after any fixed period following the estimated date. Subsection (b) is clearly inapplicable. Nothing in the notes makes them payable on "sight"—a term understood in commercial matters to mean presentment.

The banks argue that at most the "e" notation makes the notes payable at a time "on or before" or "on or about" the handwritten dates. They cite only one case

**3.** Humpty Dumpty did not draft the Code, but he could have: "When I use a word ... it means just what I choose it to mean—neither more nor less." L. Carroll, *Through the Looking Glass And What Alice Found There* 94 (Random House 1946).

which discusses "on or about" language appearing in a note, and that case is irrelevant because the issue there was not whether such language fit within subsection (a). *Clements v. Lindsay,* 320 So.2d 608 (La.Ct.App.1975), *cert. denied,* 323 So.2d 807 (La.Ct.App.1976).

## 2.

### Sections 3–109(1)(c), (d)

Acceleration and extension of payment due dates are two ways in which an otherwise definite time can be wholly indefinite but not impair a note's negotiability. The reason for this apparent inconsistency lies in commercial reality. The Code recognizes that the holder of a note would in any event have the power to extend indefinitely the payment date or dates. Therefore, to resolve any question about the negotiability of notes in the face of this power, the draftsmen explicitly stated that the power of indefinite extension in the hands of a note holder does not impair negotiability. Section 3–109, comment 5.

Acceleration refers to the power of the holder of an installment note to declare the balance of the note due and payable immediately. Often, there is a separate clause setting out the conditions under which a holder may accelerate the debt. In these notes, that clause appears at paragraph 6(b), and states that upon the maker's default the holder may accelerate. Paragraph 5 is not an acceleration clause. It allows the lender to set the date on which the first installment is due. It does not accelerate the debt; it merely describes how the beginning date for installment payments is to be set. The banks refer to Section 3–109 comment 4: "So far as certainty of time of payment is concerned a note payable at a definite time but subject to acceleration is no less certain than a note payable on demand, whose negotiability never has been questioned." Demand notes are analogous to notes containing acceleration clauses because in each instance the holder can declare the full amount due. While these notes do contain acceleration clauses, paragraph 5 is not one of them.

Subsections (c) and (d) assume by their very terms that a note is payable at a definite time. They clarify that if that definite time is subject to extension or an acceleration clause, negotiability is not impaired. They cannot be read together to mean that a note which allows a lender or holder to set an installment due date at any time nevertheless states a definite time and is negotiable. Neither the banks nor this court can find any authority for that proposition.

## 3.

### AFONYA V. ADAMS

The banks cite Judge Debevoise's opinion in *Afonya v. Adams,* No. 86–4342, slip op. (January 30, 1987 D.N.J.) for the proposition that the American Funding notes contain a definite time for repayment. That case involved a similar real estate investment scheme (in which John P. Galanis acted as an undisclosed promoter just as he did in the scheme at issue here) involving investors who gave notes in exchange for partnership interests. Against the investors' challenge, the court held that the notes stated a definite time and were negotiable.

The notes in *Afonya* provided for installment payments, but the date of the first payment was left blank. Taking into account the date of execution and the provision for monthly installments, the court construed the note to require that payments begin one month from the date of execution.

The notes in *Afonya* apparently did not contain a provision similar to paragraph 5 in the American Funding notes and did not make use of an estimated first payment date, two significant distinctions between the notes Judge Debevoise construed and the American Funding notes. Furthermore, Judge Debevoise determined a definite first payment date from the face of the note. *Id.* at 81 (citing Section 3–109 comment 2). Without asking whether the holder of an American Funding note gave notice of a first payment date, no manner of construction will enable anyone to determine any first payment date from the face of these notes.

## III

### ON DEMAND

The next question is whether the American Funding notes, which do not state a definite time for repayment, are demand notes. Section 3–108 states in part that "[i]nstruments payable on demand include those ... in which no time for payment is stated." As a fall back argument, the banks assert that if the estimated date for the first installment payment is not a definite time, then the notes state no time for repayment and must therefore be negotiable. Such is not the case here.

■ From the face of these notes it is clear that the parties intended to create installment notes, not demand notes. These notes are distinguishable from those considered by authorities which hold that notes which fail to designate a due date or a date on which installment payments are to commence are demand notes.

*P P Inc. v. McGuire*, 509 F.Supp. 1079 (D.N.J.1981), involved a note which stated that interest would be payable in three installments and included an acceleration clause. There was no indication in the note of when the principal would be due. The court held that the date or dates on which the note would be due was indefinite. Because the payment due date was indefinite, however, the note did not become a demand note:

> [I]t is apparent from the face of the instrument that the parties did not intend for this note to be payable on demand, nor would any reasonable person so interpret it.

*Id.* at 1086. For evidence of the fact that the parties did not intend to make a demand note the court pointed to the acceleration clause (which would be superfluous in any true demand note) and the fact that the parties attempted to provide for installments.

The principle that an intended installment note will not be read as a demand note has long been established in the law of negotiable instruments. *Bank of Nova Scotia v. St. Croix Drive-In Theatre*, 552 F.Supp. 1244 (D.V.I.1982), *aff'd* 728 F.2d 177 (3d Cir.1984); *Peoples Trust & Savings Bank v. Humphrey*, 451 N.E.2d 1104, 1113 n. 5 (Ind.Ct.App.1983). These cases should be distinguished from those involving form notes which contain blanks for installment payment information such as number of payments, amount of each payment, and payment due dates. These cases hold that notes containing such blanks, coupled with the absence of any other indication of a payment due date, are demand notes. *Cohan v. Flanders*, 315 F.Supp. 1046 (S.D.Ga. 1970); *Gill v. Commonwealth*, 504 S.W.2d 521, 14 U.C.C.Rep.Serv. 428 (Tex.Civ.App. 1973); *Master Homecraft Co. v. Zimmerman*, 208 Pa.Super. 401, 222 A.2d 440 (1966); *Liberty Aluminum Products Co. v. Curtis*, 14 Pa.D. & C.2d 624, 1 U.C.C. Rep.Serv. 213 (1958).

The rationale for treating as demand notes forms in which installment provisions are left blank is best stated in *Liberty*, 1 U.C.C.Rep.Serv. at 213: "And the failure to include installment payments simply and clearly means that none were intended." *Davis, supra*, may appear to present a closer case, but it is similarly distinguishable. It involved a note which stated an interest rate which was payable bi-weekly, and, at another point, stated "[t]his note is payable in [78] installments of thirty-eight dollars and forty-six cents ... each." *Id.* at 498. The court held that the note was a demand note and reasoned that providing for payment of *interest* in installments did not affect the note's demand status. More importantly, the court there held that the note's provision for 78 installment payments was equivalent to stating no time for payment at all because "there is no maturity date or dates or fixed time of payment of any installment." *Id.* at 498. The American Funding notes all contain a fixed time for each installment (monthly) and an estimated commencement date for payments. Rather than fix the commencement date, the notes provide a mechanism through which the dates will, at some uncertain time and without limitation, be fixed.

These notes are not payable on demand. The parties clearly intended an installment

arrangement. In fact, the notes are labelled "Installment Loan." Appendix A. Once the maker was notified by the holder [4] when the first payment would be due, the note would be payable at the same time each succeeding month for a fixed number of months. If the maker defaulted, the holder was entitled to accelerate the debt. The indefiniteness of the commencement date for installments is insufficient alone to transform these notes into demand notes.

In a sense, these notes fall between Sections 3–108 and 3–109. The parties' intent to make an installment note is too clear to read these notes as demand notes, but the dates on which the notes would be paid is too indeterminate to satisfy the Code's requirement of definiteness.

The overarching concern of the Code and thereby Article Three is to promote the free flow of commerce. Holder in due course status, the Code drafters believed, encourages transactions in commercial paper. *But see* Rosenthal, *Negotiability— Who Needs It?*, 71 Colum.L.Rev. 375 (1971). The decision was made that a set of formal requisites which the terms of commercial paper must meet would best serve these purposes. One requisite is that the paper be negotiable. The formalities of negotiability arose in history out of the law merchant. Today, they are codified in Article Three. There is no particular magic to them; the drafters could have chosen other formalities, although some are obvious. (For example, the requirement that a sum certain be stated would almost certainly be necessary to make commercial paper marketable with or without the Code's requirement).

Because the prerequisites to negotiability are formal, it is both simple and necessary to comply with them. To hold that these notes are negotiable would certainly preserve the integrity of these notes and in that limited sense serve the interests of commerce; however, it would reward shoddy drafting and introduce unnecessary doubt into the formalities of negotiability.

The reason for employing formalities in legal rules is to preclude the kinds of arguments that the banks offer to circumvent them here. It will not do to argue that the goal of promoting the expansion of commerce with predictably negotiable paper is served by artful reconstruction of the formalities set up initially to serve that same goal.

## IV

### ESTOPPEL

The banks insist that the investors should be estopped from asserting that the notes are non-negotiable. Section 3–104 comment 2 states in effect that the rules of negotiability should not be read to preclude a court from finding in a particular case that a maker of a note is estopped from asserting defenses against the holder of a non-negotiable instrument. *See* Section 1–103. In effect, the note is treated as if it were negotiable, but just between the holder and the estopped party.

> Connecticut's estoppel rule requires that: [O]ne party must do or say something that is intended or calculated to induce another into believing in the existence of certain facts and to act upon that belief, and the other party must thereby actually change his position or do some act to his injury which he would otherwise not have done.

*John F. Epina Realty, Inc. v. Space Realty, Inc.*, 194 Conn. 71, 85, 480 A.2d 499 (1984). The intent required is general. *West Hartford v. Rechel*, 190 Conn. 114, 124, 459 A.2d 1015 (1984).

On these facts, the banks have failed to show estoppel. It does not appear that merely executing a note of questionable negotiability, even with the hope that it be later negotiated, and then making payments on the note, estops the maker from challenging its negotiability. In essence, estoppel bars a party from asserting a position inconsistent with one he previously

---

**4.** The parties briefly raise a question over who in fact is empowered to set the first installment due date. The note refers in paragraph 5 to both the Lender and the Note Holder. In fact, a subsequent holder would have the same power, but this is an issue superfluous to this decision. Section 3–201; 4 *Corbin on Contracts* Section 878 (1951).

took. Because non-negotiable notes can still be contracts, executing them and making payments on them cannot be inconsistent with asserting that they are not negotiable. Furthermore, nothing in the pleadings or papers filed with the court amounts to an admission of negotiability.

The estoppel issue, however, should be preserved. This ruling addresses only the negotiability of the notes. If the estoppel issue had been fully briefed, logically it would be ripe for decision. One bank, Syracuse Savings, however, specifically requested the right to brief the issue should it become germane. In fairness, all of the banks should now be accorded a full opportunity to brief the estoppel question, in view of this ruling that the notes are in fact not negotiable.[5]

## CONCLUSION

The claim by banks holding American Funding notes to the status of holders in due course of negotiable instruments is rejected, and the banks are granted 60 days from the date hereof within which to brief their claims of estoppel, with reply briefs to be filed 30 days thereafter. SO ORDERED.

Dated this 8th day of September, 1987, at Bridgeport, Connecticut.

5. Only Binghamton Savings Bank and Home Bank & Trust Company, Inc. raised the estoppel issue.

APPENDIX A

# AMERICAN FUNDING LIMITED
7 LINCOLN AVENUE
GREENWICH, CONNECTICUT 06830

## NOTE
### (INSTALLMENT LOAN)

The provisions on the back are part of this note.

_____ May 1, 19 85

$ 49,106.25

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay $ 49,106.25
(this amount will be called "principal"), plus interest, to the order of American Funding Limited (the Lender). I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder".

**2. INTEREST**
I will pay interest at a yearly rate of $ 12.9 %
Interest will be charged on that part of principal which has not been paid. Interest will be charged beginning on the date of this Note and continuing until the full amount of principal has been paid.

**3. PAYMENTS**
I will pay 30 monthly installments of Principal and interest, each in the amount of $ 1923.69

commencing on the FIRST day of SEPTEMBER 19 85.
In the event I purchased Credit Life Insurance, the premium is included in the monthly installment.
e—estimated first payment date.

**4. INSURANCE**
If I am 65 years old or less, and my loan is scheduled to expire before my 70th birthday, and if I am in good health, I may buy credit life insurance through you. If I do, this insurance will pay off some or all of my loan if I die. The Certificate of Life Insurance explains the credit life insurance benefits. This insurance covers me for the number of months described below and in the amounts described below. Credit life insurance is not required to obtain credit and will not be provided to me unless I sign and agree to pay the additional cost.

The estimated cost of credit life insurance for ARTHUR L. MINARDI JR.

is $ 606.25 for Thirty months.

The amount of the insurance is $ _____

[X] I want credit life insurance.

May 1, 1985
_____ Date _____ Borrower

_____ Date _____ Borrower

[ ] I do not want credit life insurance.

_____ Date _____ Borrower

_____ Date _____ Borrower

_____ Borrower
ARTHUR L. MINARDI JR.
Borrower (printed)
HALF MOON POND ROAD
Address
RIDGE N.Y. 11961
City State Zip

_____ Borrower
DONNA L. MINARDI
Borrower (printed)
HALF MOON POND Rd.
Address
RIDGE N.Y. 11961
City State Zip

### 5. PAYMENT DUE DATE.

Lender will notify me in writing of the first payment due date, the amount of the first payment, the date of the first payment, the date of and the amount of the final payment. Interest shall not begin to be due to the Lender until the date of the notice to me, the first payment due be earlier than 30 days from the date of the notice to me.

I will begin making payments on the date set forth in the notice from the Lender to me, and continue to pay on the same day of each month until paid all the principal and interest and any other charges, described below, that I may owe under this Note.

If on the final payment due date as provided to me by the Lender in its notice, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.

I will make my monthly payments at the office of the Lender, 7 Lincoln Avenue, Greenwich, Connecticut 06830 or at a different place if required by the Note Holder.

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of my monthly payments by the end of 10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of principal and interest.

**(B) Notice from Note Holder**

If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 30 days after the date on which the notice is mailed to me, or, if it is not mailed, 30 days after the date on which it is delivered to me.

**(C) Default**

If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent the law permits. Those expenses include, for example, reasonable attorneys' fees.

### 7. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment". A prepayment of only part of the unpaid principal is known as a "partial prepayment".

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same date that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

### 8. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are (A) to demand payment of amount due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers".

### 9. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it to me at the address written beneath my signature. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address. Any notice mailed to me will be considered given to me as of the date of the mailing of the notice to me by the Lender.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 10 below. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

### 10. RESPONSIBILITY OF PERSONS UNDER THIS NOTE.

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in the Note. Any person who takes over the rights or obligations as a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

### 11. QUESTIONS ABOUT THIS NOTE

I understand that if I have any questions about this Note, I may write or call American Funding Limited, 7 Lincoln Avenue, Greenwich, Connecticut 06830.

### 12. UNDERSTANDING THIS NOTE

Before signing this Note I have read it and have received a completed copy. I understand this Note and agree to all its terms.

### 13. GOVERNING LAW

This note is to be construed and enforced according to the laws of the State of Connecticut. The makers and endorsers of this note hereby agree that all actions or proceedings brought hereon may be litigated in Federal or State Courts located within the aforesaid state and they hereby consent to the jurisdiction of any such court. The makers and endorsers of this note also agree to waive the personal service of any and all process upon them, and consent that all such service of process may be made by certified or registered mail, return receipt requested, directed to them at the addresses set adjacent to their respective signatures hereon. Service, so made, shall be complete five days after the same has been posted as aforesaid. If any portion of the Note is held to be invalid by a Court of competent jurisdiction, the balance of the Note shall nevertheless be enforceable.