[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
Plaintiff's verified complaint contains two counts. The First Count recites the recorded history of Plaintiff's property on Contentment Island Road and the creation of Parcels 1 and 1a as shown on Plaintiff's Exhibit B and the restrictive covenants CT Page 1947 governing her property starting in 1950.[1] Other allegations will be alluded to hereafter. On February 26, 1991, Defendant Association, Plaintiff alleges, "wrongfully and unreasonably" denied Plaintiff's request to subdivide Parcels 1 and 1a to create another building site on Parcel 1a "in breach of the covenant." As a result of Defendant's unlawful and unreasonable breaches, Plaintiff has suffered and will continue to suffer damages.
The Second Count includes all allegations of the First Count except Paragraph 10 alleging damages suffered. In addition, Plaintiff alleges her action in 1987 before the Darien Planning Zoning Commission (hereafter P Z) where she obtained on May 15, 1991, the subdivision approval and special permits to construct a one-family house on Parcel 1a. Plaintiff alleges her zoning permit will expire on May 15, 1992, unless Defendant approves the proposed subdivision and single family house. She asserts she has no adequate remedy at law and seeks an injunction ordering Defendant to grant such approval, also damages, costs, and other equitable relief as may appertain.
Defendant's Answer and Special Defenses admit some of Plaintiff's allegations of Plaintiff's First Count but denies Paragraphs 9 and 10 relating to claims of Defendant's unlawful acts and to damages. Defendant then admits some of the history of this case before the Darien P Z Commission and in Superior Court before Nigro, J. but denies claims as to expiration dates of Plaintiff's zoning permits and her lack of an adequate remedy at law.
Defendant also alleges three special defenses: (1) Plaintiff knew of the restrictive covenants affecting her land and took steps to secure permits from "local land use agencies" before applying to Defendant, and "thereby should be estopped from asserting the expiration dates of said permits in support of her claim for injunctive relief inasmuch as same is a self-created emergency", (2) On July 7, 1984, Plaintiff represented to the membership of Defendant that it was her intention to continue to maintain Parcel 1a "with an attractive open view and thereby should he estopped from asserting any alleged rights under the restrictive covenant or deed"; (3) on July 7, 1984, Plaintiff represented to the Defendant that it was her intention to continue to maintain this property with a(n) attractive open view and thereby waived any alleged rights she may have under the restrictive covenant or deed."
Defendant also filed a Counterclaim in which some of the history of the case is reiterated. Defendant then asserts that on February 26, 1991, the defendant's Board of Directors voted unanimously to deny Plaintiff's request for subdivision, and CT Page 1948 took no action on Plaintiff's request for approval of building plans or specifications inasmuch as that request was rendered moot. Defendant asserts nevertheless Plaintiff obtained a building permit from the Darien P Z and intends to commence construction of a single-family dwelling and has performed some construction related activities without Defendant's approval. Defendant further asserts Plaintiff's action violates the restrictions in effect and threatens to destroy the validity thereof on Plaintiff's property and on other properties located within the Defendant Association, thus resulting in increased intensity of use and development, substantially changing the nature of the area affected by the restrictions, and irreparably harming the Defendant Association, leaving Defendant with no adequate remedy at law.
Defendant requests injunctions and any other fair and equitable relief to restrain Plaintiff from selling or transferring Parcel 1a and from engaging in any construction activities on the site before January 1, 2000.
 II
The court must of course keep in mind in reading these covenants that the construction placed upon them by both parties is strong evidence of their intent and meaning. This would be so at least to the extent that the parties agree on their effect. For example, both parties agree that a subdivision in this case and plans for one-family house require approval of the Defendant Association. Accordingly, Plaintiff has submitted its request for such approvals to Defendant Association. Thus in Hall v. Solomon, 61 Conn. 476, several pieces of real estate were sold to purchasers, including Defendant, on a parol agreement, that no portion of the lots should be used for the sale of liquor. All purchasers had kept this agreement except that one store was a drug store where package license liquors were sold as ordinarily sold by druggists, not to be drunk on the premises. None of the property owners had objected to such use of said store. The court at p. 484 said:
 "We are inclined to think that such a use is not within the prohibition of the agreement. The parties in interest so interpreted it and we may properly so regard it."
The Restatement of Contracts 2d 201 puts it this way:
 "(1) Where the parties have attached the same meaning to a(n). . . agreement or a term thereof, it is CT Page 1949 interpreted in accordance with that meaning."
17 Am.Jur.2d Contracts 361: words and phrases are to be interpreted in accordance with the meaning invested in them by the parties.
 III
Plaintiff acquired the subject property in 1983 from the Estate of Robert Cudd who previously had received a warranty deed from Norton Inc. Parcel 1a was originally in 1950 a part of a 4.9 acre tract on the west side of Contentment Island Road. a private way owned by Defendant Association. The deed from Norton Inc. to Cudd contained certain restrictions and covenants[1] designated as Plaintiff's 1, 2, and 3 in the deed, Plaintiff's Exhibit A.
The successor to the grantor Norton Inc. is the named Defendant Association.
The 4.9 acre tract owned by Cudd was divided into two pieces, one 3.9 acres in size and the other one acre. This was done with the approval of Norton Inc. in 1959 (Exhibit C) without waiver or approval in advance by Norton of any right "to enforce said restrictive covenant . . . in connection with the entire said premises containing 4.9 acres conveyed to Mr. Cudd." This permitted Cudd to convey the 1 acre parcel to a third person.
In 1983 the Estate of Robert Cudd conveyed 4.9 acres (later to become Parcels 1a and 2a on Exhibit B) to Plaintiff and one Glanville as tenants in common. They then applied in July, 1984, to the P Z Commission[2] to divide the 4.9 acres between them "so that we may each have the practical considerations of separate ownership. . . . It is not, for example, an application for a building permit. . . . It is our intention to continue to maintain this property with an attractive open view." This was the language of Plaintiff's and Glanville's letter to all their neighbors. See Footnote 3. Most of the P Z hearing of July 17, 1984, is contained in Footnote 2.
On February 13, 1985, Attorney Atkinson, representing Plaintiff and Glanville, (as he had before the P Z Commission in July, 1984) wrote to Attorney Warren MacKenzie, then President of the Defendant Association, to obtain the Association's approval of the division as shown on Exhibit B. He stated that since the lots were not approved as building sites but only to be "annexed" to their existing house lots, he did not feel the restrictive covenants applied, but to avoid CT Page 1950 uncertainty he was requesting the Defendant's approval.
On March 18, 1985, Warren MacKenzie as president of the Defendant Association sent a letter to Plaintiff and Glanville approving the division of their 4.9 acres. Added to the letter was the following language:
 "It is understood that the approval given herein is not intended as a waiver of any other restrictive covenant contained in the deed referred to above, nor a waiver of the right of the undersigned to require approval of any further division of either Parcel 1A or 2A as shown on said map."
The letter was signed by Warren MacKenzie as president of the Defendant Association.
In 1985 Glanville quitclaimed her interest in Parcel 1a to Plaintiff. (Exhibit G).
Until November, 1985. Attorney Warren MacKenzie was president of the Defendant Association. He was succeeded by one Joseph Allen. In early 1986 Plaintiff retained Mr. MacKenzie to represent her.[4] Then later in 1986 Mr. MacKenzie filed an application with the P Z for approval to "subdivide" Plaintiff's property and create a two acre parcel west of Contentment Island Road which is now known as Parcel 1a. The first application was denied,[5] but was refiled and subsequently approved on July 14, 1987, (Exhibit H) subject to many modifications and restrictions. Mr. Mrs. Norman, property owners and residents on Contentment Island Road, appealed this decision, but the appeal was denied by Nigro, J. on June 22, 1989, and the Connecticut Appellate Court rejected certification in November, 1989.
In January, 1990, Attorney MacKenzie applied to Defendant Association Board for approval of the "subdivision" and Plaintiff's building plans. Defendant claimed it was not empowered to act on the application. Plaintiff then sought and obtained injunctive relief requiring Defendant to review Plaintiff's request or advise the court that it waived that right.
 IV
Pursuant to the court's order (Hodgson, J.), the Defendant held a Public hearing on February 5, 1991, to consider Plaintiff's request. On February 26, 1991, the Defendant voted CT Page 1951 unanimously (17 board members voting. 2 board members not present, no votes in favor of Plaintiff) to deny Plaintiff's request as set forth in a resolution dated March 25, 1991.
As previously indicated, it should be noted that Plaintiff at all times was aware of the restrictive covenants running with the land on her property. In 1985 Plaintiff and Glanville had requested the Defendant to "subdivide" a tract of land on the west side of Contentment Island Road for the sole purpose of "annexing" it to other land owned by them on the east side of Contentment Island Road. As indicated, they represented to Defendant that this "subdivision" was only for the purpose of "annexation" and not for the purpose of transfer or sale. In support of their application, by their letter of July 7, 1984, (see Footnote 2) they further represented to Defendant and others that it was their intent to preserve the parcel (shown on Exhibit B as Parcels 1a and 2a) as open space in order to maintain the natural environment and scenic vistas.
Based on these representations, the Defendant had granted permission for said "subdivision" for "annexation" purposes only. In fact, "annexation" was actually impossible, as the court has seen, because Parcels 1a and 2a were separated from Parcels 1 and 2 by Contentment Island Road, so that what Plaintiff and Glanville were probably talking about was a split of the tract of land on the west side of the Road between Plaintiff and Glanville as Exhibit B shows, which they dubbed an "annexation" to their respective lots across the Road on its east side. The only "subdivision" created in reality was what Exhibit B shows as Parcels 1a and 2a. In fact this whole proceeding before the P Z Commission appears to be totally unnecessary. If all that the Plaintiff and Glanville were seeking was a division of the land between themselves, it would seem a surveyed line and exchange of deeds between them would have accomplished that without seeking P Z approval of an "annexation" which the Commission was not empowered to grant them. The definition of a "subdivision" is contained in Conn. Gen. Stat. 8-18: ". . . `subdivision' means the division of a tract or parcel of land into three or more parts or lots. . ."
Exhibit Q discloses that this strange "subdivision for annexation Purposes only" was expressly understood to be only that, and nothing more, and was not intended as a waiver of any deed restrictive covenants nor a waiver of Defendant's right to require approval of any further division of the "annexed" lots.
Nevertheless, thereafter, contrary to Plaintiff's and Glanville's express representations which persuaded Defendant to grant the "subdivision for annexation purposes only," Plaintiff in 1986, about one year after filing the first application for CT Page 1952 approval, applied to the Darien zoning authorities to create a separate building lot and made no effort first to seek approval of such a lot from the Defendant until January 16, 1990, even though she could have applied in 1984 or any time thereafter. Here again Plaintiff's application describes itself erroneously as a "resubdivision." The definition of a "resubdivision" is contained in Conn. Gen. Stat. 8-18 and means "a change in a map of an approved or recorded subdivision or resubdivision." Since the first application seeking the "annexation" described previously in this memorandum was not a subdivision as defined by the statute, utilizing the word "subdivision" does not make it one and P Z was wrong in so designating it. It therefore follows that trying to describe her second application for a building lot as a "resubdivision" is wrong because there was no subdivision as defined by statute to begin with. It appears that Attorney Warren MacKenzie, representing Plaintiff and no longer president of the Defendant Association, recognized this was not a "resubdivision" and amended Plaintiff's application to indicate it was a "subdivision." Here again, however, it could not meet the requirements of the definition of the latter under Conn. Gen. Stat. 8-18.
The Defendant found, in Exhibit Q, that the subject property is specifically designated as a natural, scenic and conservation area in the Darien Plan of Development and that it is designated as open space in the Darien Plan of Development. The Defendant also found the preservation and enhancement of tidal wetlands is another specific purpose of the Plan of Development, and Contentment Island itself is a duly designated part of those wetlands. In addition, another purpose of the Plan of Development is the preservation of visual public access to scenic areas such as the subject property.
At the Defendant's hearing on the Plaintiff's application, in evaluating Plaintiff's request, expert testimony of the Association's witness, Redniss, concluded Plaintiff's request was deficient in many respects under zoning, planning and other standards.[6] The Defendant refused to grant approval of the Plaintiff's new proposal for subdivision in order to retain the Plaintiff's parcel as open space for all the reasons set forth in Exhibit Q. Footnote 7 contains Defendant's resolution in response to Plaintiff's application.[7]
 V
While some of what follows in this section may be repetitive of what has been said, the court nevertheless deems it desirable to keep clearly in mind the chronology of hearings and events from 1984 on. CT Page 1953
The minutes of July 17, 1984 of the Darien Zoning Authority (p. 3) in connection with Plaintiff's application of "subdivision" solely for "annexation", (supplied by Plaintiff, entitled "Supplement to Record" dated August 13, 1991), relating to its approval of the Lunn-Glanville tract, show that Attorney Atkinson, representing Lunn and Glanville, further indicated that they bought this four acre tract "to protect their existing properties on the easterly side of Contentment Island Road." He offered to redraft the map (now Exhibit B) to show each of these parcels as being part of the lots across the Road. One of the zoning officials questioned how that could be done since the lots do not physically join one another. Another Commission member asked what open space provisions were being made by the applicants as part of the subdivision regulations. Atkinson then replied that the two lots would essentially be "totally open land." (Emphasis added.) The first mentioned official then explained he had difficulty with creating non-building lots because subdivision regulations only allow for building lots. Atkinson again asserted he would be willing to file two separate maps showing the newly created parcels as being only an "annexation" to the existing parcels across the street. (What legerdemain would accomplish such an "annexation" he did not specify.)
On September 11, 1984, the P Z approved the application solely for "annexation" as depicted on the map, and not as building sites.
Certain inferences may be drawn from the Plaintiff's modus operandi as manifested in connection with her first application for "annexation," her second application to convert Parcel 1A into a building lot, and statements made by Plaintiff and Glanville and their attorney with reference to her intentions and objectives as to that "annexation" application. The court will discuss them later.
At the hearing before the P Z on July 14, 1984, on Plaintiff's "Resubdivision Application No. 560," Attorney Atkinson, representing Plaintiff and Glanville, did not want to create a conservation easement on this land because it would be "permanent" and he didn't "know what could happen 20 years down the line — 50 years down the line." (The court notes that the restrictive covenants in issue in this case expire on January 1, 2000.) The minutes of the hearing disclose that Attorney Atkinson stated the "property has probably got every environmental control that exists on the records effecting (sic) it. . .". (Emphasis added.)
On February 13, 1985, Attorney Atkinson requested approval of Defendant Association for division of Plaintiff's and CT Page 1954 Glanville's tract for "annexation" purposes only.
On March 5, 1985, the Defendant Association held a meeting at which Warren MacKenzie, its then president, made "general comments." A summary of them appears in Exhibit 8 of the Tokeneke Association hearing on February 5, 1991. The summary is as follows:
 "Mr. MacKenzie has a letter from an attorney (Atkinson) requesting permission for Mrs. Glanville and Mrs. Lunn to divide a four acre parcel of land into two acre parcels . . . The board has agreed to the division but wants a letter drafted from the attorney stating all restrictions according to the deed . . . would be respected by Mrs. Glanville and Mrs. Lunn."
This approval was granted on May 14, 1985.
In November, 1985, Attorney Warren MacKenzie ceased to be president of the Defendant Association and a member of its board of directors. As already indicated, Plaintiff then retained him as her counsel in early 1986 to act in her behalf on the same matter he had been involved with as president of Defendant Association in 1985. On February 24, 1987, he applied for a building lot approval on Parcel 1a and appeared before the P Z as counsel for Plaintiff. He was told by Mr. Nurme, the Director of Planning of the P Z, that in 1984 the tract of land then owned by Plaintiff and Glanville was divided and a map filed on record which was done on Plaintiff's expressed intent "to divide the property to simplify matters in the handling of their individual family estate" and to "permanently protect their view from their existing houses." He was told there would be no development on either of these parcels in the forseeable future. The owners did not want to have a permanent conservation easement placed on the land records because "no one knows what the Regulations or thinking would be in 20 to 30 years."
At this hearing Attorney Brown, representing Mr. and Mrs. Norman, neighbors of Plaintiff, in opposition, pointed out that the mean high water level in 1985 on a map filed in the land records showed it to be substantially higher now than the 3.65 feet above sea level in 1929. It presently would be 4.15 feet above sea level. Evidence also was offered by one Slayback in behalf of Plaintiff indicating the highest high tide on September 18, 1986, according to the Department of Environmental Protection, was 5.2 feet above sea level. CT Page 1955
This 1986 application was denied on March 10, 1987, because it was incomplete. In this denial the P Z ruled as set forth in Footnote 5.
For some reason not apparent from the minutes of the P Z on February 24, 1987, Attorney MacKenzie noted that he was president of the Defendant Association in 1984 when Plaintiff and Glanville sought the division and "annexation" of their property. He stated that division was approved. Thereafter, he ceased to be president and Plaintiff requested him to represent her on this application. Although apparently not queried on this, he volunteered: "He felt that he had no conflict of interest in this regard." See Footnote 4 for the court's comment. He did not, however, inform P Z that the Defendant Association's approval in 1985 was strictly limited and subject to the restrictive covenants on record. Certain other aspects relating to this P Z hearing of February 24, 1987, are unusual as mentioned in Footnote 8.[8]
There are some additional facts and information that the court considers important to mention about the proposed house plans, and they are enumerated as follows:
(1) The house plan for the proposed two-story building has no basement and is 29 feet high above the ground level. When asked if the septic system would work if the land is flooded, Plaintiff's expert witness Slayback stated it will function "if it's flooded by a tidal flood, which is generally an event of some two hours duration, three hours duration, tops." When asked whether the system would "overflow into the surface," Slayback's ambivalent answer was, "I don't think so." He went on to say that if you had a "long-term inundation," the system would fail. He also conceded that the 500 gallons he said the system would handle would not get to Long Island Sound as pure, clean potable water and he would not drink it.
(2) The mean high water level in 1929 was established as 3.65 feet above mean sea level. As of 1991, latest data shows mean high water as "close to 4.4 elevation and the approximate mean high water elevation in Darien is 4.24 and moving up constantly using data of the National Oceanographic and Atmospheric Administration.
(3) Plaintiff's plans show birch trees on the land being cleared away so as to give the proposed house a clear view to the Sound. Plaintiff's counsel said Plaintiff would not clear any trees without Town's permission.
(4) Zoning Regulations of the Town 841 and 1025.9 CT Page 1956 contain provisions for the protection of environmental features. Special Permits expire one year after approval. An extension of not more than six months may be granted. 1009. (See Exhibit K). But even if it expires, the expiration of a special permit does not bar re-application for a permit. (The Regulations do not state that only one extension may be granted.)
(5) The septic system will be inundated periodically several times a year with respect to storms that occur in this area and with respect to what is called "fetch," a predominant wind coming from the southwest, moving the tide higher than normal on the Connecticut shore. The system will be underwater for approximately two or three hours and that time duration depends wholly upon when that occurrence happens with respect to high tide. It will be underwater two or three hours before high tide and two or three hours after high tide. Contentment Island Road in front of the subject property and the entire property have been underwater from time to time.
(6) Under the Town zoning regulations 302 provides that the regulations shall not be deemed to interfere with . . . or otherwise affect any covenants or other agreements between the parties, provided where the regulations impose greater restrictions, the latter shall prevail.
See Footnote 6 for further details of Redniss' statement at the public hearing. Defendant Association was justified in accepting Redniss' analysis as credible.
 VI
The court turns now to certain inferences it believes can be reasonably drawn from the manner in which Plaintiff has handled her request up to this point. The court notices Plaintiff's testimony before Hodgson, J. mentioned above in which she admits that "no one thought the (subject property) was buildable, (and) to be perfectly honest, that is why we paid so little for it." When Hodgson, J., asked, "No one thought it was buildable?" Plaintiff replied, "And we didn't either when we bought it . . ." In addition, the court notices the statements made by Plaintiff's counsel, Attorney Atkinson, in her behalf on her original request to P Z for "annexation." This has been set forth previously. The court also notices the letter sent by Plaintiff and Glanville to all members of the Defendant Association dated July 7, 1984, in which they state: "It is our intention to continue to maintain this property with an attractive open view."[3] Plaintiff's and Glanville's original application sought only approval of "annexation" of the subject property to other property located on the easterly side of Contentment Island Road and they repeatedly emphasize that the CT Page 1957 division of their jointly owned land on the west side of the Road was not to obtain their approval as building sites but to "annex" their respective pieces to their existing home lots on the other side of the Road. Attorney Atkinson, as noted above, was careful to stress that Plaintiff and Glanville had purchased this tract on the west side of the Road "to protect their existing properties on the easterly side of the road" and that the two lots to be "annexed" would essentially "be totally open land."
With these representations the P Z approved the "annexation" as did the Defendant Association subsequently. Attorney MacKenzie, on February 13, 1985, sent the letter of a circumscribed approval as mentioned above, containing limitations.
It wasn't very long after obtaining this approval of the "annexation" in mid 1985 that Plaintiff, having switched counsel from Attorney Atkinson to Warren MacKenzie, who no longer was president of the Defendant Association, filed an application with P Z to convert Parcel 1a, as "annexed" in 1985, into a building site by "subdividing" it into Parcels 1 and 1a. This application was denied on March 13, 1987, because it was incomplete. In doing so the P Z found it was understood in 1984 on the "annexation" hearing "that no new building lot or lots were being created either for immediate or future use, but rather, the declared purpose was strictly for conservation purposes, i.e., the permanent protection of respective views from the two existing residential properties (of Plaintiff and Glanville on the east side of the Road.)" See Footnote 5, underlined language.
Since the application to the P Z to "annex" land to other land owned by applicants was unnecessary and in fact improper because neither zoning statutes or ordinances empower the P Z to "annex" properties, and since the attempt to "annex" Parcels 1a and 2a to Parcels 1 and 2 respectively was in any event impossible because the former two pieces were physically separated from the latter two by Contentment Island Road owned by the Defendant Association, the only thing that was accomplished by their application was to draw a line between Plaintiff's and Glanville's portions and labeling them 1a and 2a. Why, then, did Plaintiff or Glanville pursue this procedure so avidly before the P Z?
The court keeps in mind that restrictive covenants are not abrogated, interfered with, or annulled in any manner by the zoning regulations except where the latter impose greater restrictions. See 302 of the Town Zoning Regulations. Thus, regardless of what P Z does with granting applications for CT Page 1958 building sites, provisions of restrictive covenants still govern. It would seem, therefore, that normally an applicant should first obtain approval of a building site or plans for a proposed house from Defendant Association prior to applying to P Z. Plaintiff, however, has reversed this process, and the court believes this was done for the express purpose of being able to present zoning approvals, if not a complete fait accompli, as a persuasive means of obtaining the Defendant Association's consent. For the same reason it pursued vigorously the so-called "annexation" procedure mentioned above even though it may have been legally useless because, notwithstanding that fact, the idea could serve to obtain P Z's imprimatur for drawing a line between the parcels of Plaintiff and Glanville as a first step toward proceedings thereafter to apply for a building site approval. The fictitious "annexation" served no other purpose but to create a flimsy verbal excuse to split the westerly land area and thus make the next attack a little easier, viz., to convert the two parcels, created by drawing the dividing line, into building sites. It greased the approach to that objective by making it appear the two parcels were already there and all the P Z had to do was bless them as building sites, and it placed the Defendant Association in a prejudiced position by approving a division of the whole westerly parcel into two lots even for "annexation" only.
All of this was done in complete abnegation of the very clear and specific statements and promises of Plaintiff and her counsel that these parcels would remain open land and would provide a scenic view for Plaintiff's and Glanville's homes on the easterly side of Contentment Island Road which Plaintiff and Glanville claimed they sought to "protect" when they bought the westerly tract at a cheap price because it was not buildable.
 VII
The court must now summarize the legal issues raised by the pleadings as follows:
(1) Was the Defendant Association's refusal to approve the subdivision creating a building site on Parcel 1a and the refusal to approve Plaintiff's plans for new one-family residence on that parcel wrongful and unreasonable?
(2) Does the fact that the zoning permits obtained by Plaintiff have expiration dates in the spring of 1992 create the basis for granting injunctive relief?
(3) Is the Plaintiff estopped from making a claim founded in the expiration dates of her zoning permits? CT Page 1959
(4) What is the legal effect of Plaintiff's and their counsel's representations to members and property owners and P Z made in 1984 and thereafter?
(5) Did Plaintiff waive her rights to obtain the Defendant's approval of the subdivision and her plans because of her various statements and stated intentions in 1984 to maintain Parcel 1a with an attractive open view?
(6) Is Defendant entitled to injunctive relief against Plaintiff until the year 2000 under the circumstances of this case?
The court will deal with the substance of these questions hereafter. Inasmuch as they tend to blend into each other in whole or in part, the court does not feel itself bound to separate this discussion into discrete sections but would rather allow the flow of thought and analysis to pick up the portions of these questions that seem to have relevance with each other as the court proceeds.
 VIII
The Defendant denied specifically the Plaintiff's request for approval of the subdivision and in its brief decided such denial made unnecessary a specific ruling on the Plaintiff's building plans because they were irrelevant without first, the approval of the subdivision. The court, however, finds that the Defendant conducted a public hearing at which considerable time and attention was given not only to the question of approving a building site, but also the plans proposed for a one-family dwelling upon that site. The Defendant's expert expatiated at length on the proposed plans as did Plaintiff's experts. The court therefore concludes that the denial of the approval for a building site impliedly, at least, was intended as a denial of the proposed plans for a building on Parcel 1a. The Defendant's Board on March 25, 1991, voted unanimously to deny the request of Plaintiff, which had been presented in a letter of January 16, 1990, written by Attorney Warren G. MacKenzie as counsel for Plaintiff. In its first paragraph it seeks approval of both a subdivision creating a separate parcel (Parcel 1a) for a building site and an approval of plans and specifications for a new house on that parcel. It is therefore only fair and proper to consider that Defendant's denial of Plaintiff's request covered both the "subdivision" and the plans and specifications for a new home. Paragraph 13B of Defendant's Resolution of March 25, 1991, (Exhibit Q) refers specifically to their expert witness Redniss' testimony which analyzed quite fully the Plaintiff's plans. Defendant claims, as mentioned, with the CT Page 1960 denial of the subdivision, it serves no purpose to consider the plans and specifications for a one-family house. There is some logic attached to this position, but the court nevertheless will consider both the questions of the subdivision and the house plans as submitted.
 IX
The restrictive covenants in this case are set forth in Footnote 1. As Plaintiff states in her brief, Plaintiff requested Defendant Association to review and approve the subdivision and single-family residence as approved by P Z, the request being submitted by letter of Attorney Warren MacKenzie dated January 16, 1990, pursuant to the subject restrictive covenant.
Plaintiff asserts Defendant's denial of her request is unreasonable and not in good faith. Defendant on the other hand contends that the Defendant's discretion is unfettered and reasons for its refusal to approve the request are immaterial. See Robinson v. Weitz, 171 Conn. 545, 549.
The Defendant's stance on this issue is not entirely supported by Eis v. Meyer, 213 Conn. 29, 37, where the restrictive covenants provided specifically that the easement would terminate "when any building on said land is enlarged." An implied covenant of good faith and fair dealing does not apply "to achieve a result contrary to the clearly expressed terms of a contract." This is the Eis rule, which is not applicable here.
Robinson, supra, has been modified in a case involving a commercial lease, now requiring that when a landlord contractually retains the discretion to withhold consent to an assignment of a tenant's lease, he must exercise that discretion in a manner consistent with good faith and fair dealing. Warner v. Konover, 210 Conn. 150, 155. No parameters were established in Warner covenants for that discretion, and for that reason it had to be exercised in a manner consistent with good faith and fair dealing.
To weigh the good faith and fair dealing of the Defendant Association, the court should of course also weigh the good faith and fair dealing of the Plaintiff. If Plaintiff's conduct lacks those qualities, it can certainly have some bearing on the disposition of Plaintiff's request. The court must therefore advert to the detailed delineation presented previously in this memorandum but without total repetition of the detailed history relating to Parcel 1a: beginning with the strange "annexation" procedure: with the repeated representations to the P Z and CT Page 1961 later to the Defendant Association that she was not seeking approval of a building site and that she intended to retain her property with an open view: that she bought the property knowing it could not be built upon and therefore paid a "cheap price" for it: her letters to some 250 members of the Defendant Association assuring them she was only seeking "annexation" and not a building site: that she bought the property solely to "protect" her existing home on the east side of Contentment Island Road; the replacement of Attorney Atkinson of Cummings and Lockwood by Attorney Warren MacKenzie, former president of the Defendant Association, to undertake the second phase of Plaintiff's project before the P Z first, and then before the Defendant Association (at which point the firm of Cohen Wolf appeared for Plaintiff at a public hearing called by the Defendant Association); Plaintiff's quoted testimony before Hodgson, J., set forth above; the attempted complete reversal of all Plaintiff's representations previously made to the P Z and to Defendant Association and its individual members, claiming all these representations had no relevancy to her present request for approval of a building site subdivision and approval of plans for a house on Parcel 1a in flat contradiction of all Plaintiff's earlier statements made to persuade favorable action on her request for "annexation" as a result of which the Defendant Association agreed to approve Parcel 1a solely for "annexation" purposes and not as a building site.
As the court has pointed out, the chronology of events in this case clearly indicates that Plaintiff, both in her first request for "annexation" and in her second request for a building site and plan approvals, chose to go first directly to the P Z rather than to the Defendant Association, notwithstanding the fact that under the zoning law (302, Darien Zoning Regulations) restrictive covenants entered into by private parties govern so that action by the P Z is subject to action by the Defendant Association. It would therefore seem that Plaintiff should have obtained approval of the Defendant Association first before going to the P Z. This is a matter of significance in this case because Plaintiff contends now her zoning permits will expire in May, 1992, and therefore she is entitled to injunctive relief. It seems, however, to the court that Plaintiff has, by her own actions, placed herself in this dilemma. She knew she had to face the issue of Defendant Association's approval and she should therefore have gone to them first. If she obtained that approval, she could have then presented the matter to the P Z and not be confronted with any time constraints. If she failed to obtain the Defendant's approval, she would be where she is now but without any time constraints.
The court infers from Plaintiff's conduct that her modus CT Page 1962 operandi up to this point was designed to "get her foot in the door," so to speak, with her "annexation" request to the P Z first, making it a little easier to pursue her request thereafter for a subdivision and plan approval to the P Z, and with these two P Z approvals, to confront the Defendant Association with them, thinking, that with her representation by Attorney MacKenzie, former president of the Defendant Association, sufficient pressure and influence could then be brought to bear upon Defendant Association to accept the P Z's imprimatur and grant a waiver of the restrictive covenants or at least approve her application. Considering all of the circumstances surrounding Plaintiff's first request for "annexation," all of which have been alluded to previously in detail, causing the Defendant Association to accede to the "annexation" only because of Plaintiff's representations, but not granting approval as a building site, it seems that either an estoppel as claimed by Defendant, or the "clean hands theory" of equity or both have application here. The standard of good faith and fair dealing by Plaintiff is open to serious question. Furthermore, the Pursuit of the "annexation" request to divide the land purchased by Plaintiff and Glanville was a maneuver, as mentioned above, to place both the P Z and the Defendant Association in the position of having approved the creation of Parcel 1a and thus making it somewhat more difficult for both the P Z and Defendant Association to reject a subsequent request for approval of Parcel 1a as a building site. The Plaintiff's "annexation" request thus prejudiced the Defendant Association's position to this extent in dealing with Plaintiff's second request for subdivision and approval of house plans.
Another contention by Defendant raises the question of Plaintiff's waiver of her right to obtain a building site on Parcel 1a. Plaintiff was at all times represented by able counsel. It is reasonable to presume that she discussed with them what she could do with the property. The court has already referenced Plaintiff's testimony before Hodgson, J., in which Plaintiff admitted at the time of its purchase that "no one thought the property was buildable, and that is why we paid so little for it." Then at the hearing before the P Z on Plaintiff's first request for "annexation" her counsel stated that once the land was divided between them, the property (Parcel 1a and 2a) "would essentially be totally open land." (Emphasis added.) Finally, when Plaintiff sought approval from Defendant Association for her "annexation" request, she wrote to all members of the Defendant Association on July 7, 1984, that "it is not an application for a building permit" but is only seeking to divide the property (owned by Plaintiff and Glanville as tenants in common) "so that we may each have the practical considerations of separate ownership . . . It is our intention to CT Page 1963 continue to maintain this property with an attractive open view" (Emphasis added.)
The law relating to the requirements of the "clean hands theory" in equity, the matter of estoppel, and the matter of waiver seems to be as follows:
(1) Clean hands rule. Speaking generally of restrictive covenants, Tiffany has this to say: (3 Tiffany Real Property (3rd Ed.) 858):
 "The number of decisions in comparatively recent years involving the validity, construction and effect of agreements restricting the use of real property indicate the increasing use being made of them. This reflects, it has been aptly commented, the expansion of the law to meet the demand of home owners for a protection adequate to the more crowded conditions of modern life. The basis of the modern rules for the enforcement of such restrictions is that one taking land with notice that it is subject to agreement of this character will not, in equity and good conscience, be permitted to violate its terms."
It is a fair inference to draw from the Plaintiff's several statements quoted above that, considering the course of Plaintiff's conduct heretofore set forth, Plaintiff did not in fact intend to carry through on her representations and that they were made to achieve the "annexation" which otherwise would not have been granted and thus make it easier for Plaintiff to pursue the approval of Parcel 1a as a building site. This is similar to Cohen v. Cohen, 182 Conn. 193, 205, where the court found that although the Defendant in that case had promised to reconvey property at a future date to his mother in order to persuade her to convey it to him initially, he never, in fact, intended to do so, and refused to keep his promise until litigation forced him to comply.
The Plaintiff's request for "annexation" and the present request to "de-annex" Parcel 1a to make it a building site must be viewed together because they involve the identical parcel of land. In the court's judgment, honest and fair-minded persons would pronounce that what Plaintiff has done here is wrongful to represent her intentions to retain Parcel 1a "as totally open land" so as to have "an attractive open view" and then, within a relatively short time, to violate those representations by CT Page 1964 seeking what she initially said she was not seeking, viz. a building site approval. This is not "fair dealing and righteous conduct." (Boretz v. Segar, 124 Conn. 320, 323).
Finally, these representations of the Plaintiff led to Defendant Association's approval of the "annexation" of Parcel 1a to Parcel 1, thereby allowing the Plaintiff to "get her foot in door" by creating a new lot (Parcel 1a) without building approval which the Defendant Association would not have granted except for Plaintiff's disingenuous and misleading statements. Now, as part of this saga, the Defendant Association is confronted with the new lot (Parcel 1a) and the request to approve it as a building site. Plaintiff's conduct has prejudiced the Defendant Association because it consented to the "annexation" and the creation of Parcel 1a without building rights, only to be confronted now with a request to convert that Parcel into a building site. It has placed the Defendant Association in a more difficult situation now in ruling on this request than it would have been had the "annexation" been denied as it could have been initially. Thus the Plaintiff's wrongful conduct and the prejudice imposed on Defendant Association provided the two components necessary for the operation of the "clean hands maxim."
(2) Estoppel. The two elements necessary are cited in John F. Epina Realty Inc. v. Space Realty Inc., 194 Conn. 71,85, and Papcun v. Papcun, 181 Conn. 618, 621. "The party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." Reinkiewicz v. Reinkiewicz,180 Conn. 114, 119; John J. Brennan Construction Corp. v. Shelton, 187 Conn. 695, 711.
There is, as the court acknowledges, a close similarity in this case to the clean hands principle and estoppel, just as the court notes there is between estoppel and waiver. It is unnecessary to reiterate here what has been said above on the facts in discussing the clean hands maxim.
(3) Waiver. The instant case involves an implied rather than an express waiver. The court refers to Novella v. Hartford Accident Indemnity Co., 163 Conn. 552, 564-565 for a discussion of waivers and estoppel which summarizes the two concepts as being based on the "principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong," quoting from R. H. Stearns Co. v. United States, 291 U.S. 54, 61-62. CT Page 1965
An implied waiver obviously does not have to be express. It may, as here, consist of conduct from which a waiver may be implied. In other words, it may be inferred from the circumstances if it is reasonable so to do. See Novella, supra, p. 562. The group of statements made by Plaintiff when she purchased the subject property, when she sought "annexation," when she wrote to all 250 members of the Defendant Association to obtain approval of "annexation," and in her testimony before Hodgson, J., all of which have been set forth herein previously, are sufficient to establish a waiver of her right to seek a subdivision for building a house on the subject property.
Thus, it is manifest that from the rationale behind the clean hands maxim, estoppel, and implied waiver that these legal and equitable concepts have a great deal in common. The facts in the present case lend themselves to the application of each of these theories.
 X
But even if the court were to ignore the existence of the clean hands doctrine and the rules of estoppel and implied waiver, there are substantial other reasons why the Plaintiff's claim for injunctive relief must fail.
Plaintiff stresses the fact that she is confronted with expiration dates on her zoning permits that require the court to order an injunction to mandate the Defendant Association to act quickly and favorably upon her request. The court has already pointed out that Plaintiff, by going to the P Z first and now to the Defendant Association, has created her own problem as to time constraints. Inasmuch as private restrictive covenants must be complied with, Plaintiff could and should have gone to Defendant Association first. The court infers that she did not follow this sequence for tactical reasons. In any event, any time constraint urgency that exists is the result of her own chosen course of conduct.
The question of good faith and fair dealing on the part of the Defendant Association must be judged by what reasons, if any, it may have had to reject Plaintiff's request. The Plaintiff's Parcel 1a is located in an area specifically designated as a natural, scenic and conservation area of Darien in its Town Plan of Development. The CAM Analysis Report submitted and revised as of September 9, 1987, misstates that fact and does not show the area as described by the Town Plan of Development. Testimony at the public hearing bore this out. The subject parcel is designated as open space in the Town Plan of Development in order to preserve a sense of natural environmental openness to preserve the character of a suburban CT Page 1966 community like Darien, which is consistent with the purposes of the original deed restriction.
Contentment Island, the area controlled by the members of the Defendant Association, involves some tidal wetlands, the preservation and enhancement of which is one of the objectives of the Town Plan of Development. Another purpose of that Plan is to preserve the visual public access of scenic areas such as the subject parcel. The Defendant Association is entitled to consider all of these factors in reaching its decision on Plaintiff's request.
The Plaintiff's application for approval came to the Defendant Association on January 16, 1990, and the Defendant was entitled to consider, among other things, the status of municipal, state, and federal regulations in effect on that date. In a number of respects, Plaintiff's plans are deficient. Raymond Redniss of the firm of Parsons, Bromfield, Redniss Mead in Stamford analyzed the Plaintiff's plans and found many deficiencies. Redniss conceded that most deficiencies probably could be amended to meet applicable zoning requirements, but they were not presented to the Defendant Association in any amended form. Under these circumstances, it was only obligated to pass judgment on what was submitted to it. One very important factor that could not be amended is the scenic impact. That, said Redniss, was a value judgment to be made by the Defendant Association.
Accordingly, the court went to the subject property to view it accompanied by counsel for both sides.
The Plaintiff's plans disclose a two-story house without a basement rising to a height of 29 feet above ground level. Plaintiff's expert claims if tidal flooding occurs, its duration would be between 2 and 3 hours. The septic system, he says, will work, but when asked if the system would overflow into the surface," his answer was, "I don't think so," a very ambivalent statement, to say the least from an expert, and then he added that in a long-term inundation, the system would not work. He also conceded that the 500 gallons that would be processed through the septic system would not be potable. If tidal flooding occurs, it would be 2-3 hours coming in and another 2 to 3 hours going out. There is no question the septic system will be inundated periodically several times a year. When inundation recedes, non-potable water and whatever else might rise from the septic tank and its leaching fields would flow west into the cove, or south into the inlet from the cove along the south border of Parcel 1a, or east to or across Contentment Island Road, or remain in part on Parcel 1a. Elevation of the house is necessitated as a measure against flooding by CT Page 1967 inundation or otherwise. The Defendant was justified in considering these factors as a basis for denial of Plaintiff's application.
Furthermore, Plaintiff's application and plans placed before the Defendant Association would not meet regulations in 1990, the date of Plaintiff's submission of its application to the Defendant, unless they were amended.
Redniss pointed out that the mean high water mark in Darien has been 4.24 and is getting higher constantly. Plaintiff's experts used a figure of 3.65 from 1929. Manifestly, the higher the mean high water mark would result in greater flooding problems and more severe periodic inundations.
The court is satisfied from taking a view of Parcel 1a that the construction of a house upon it would substantially interfere with the scenic view across Parcel 1a to the cove and beyond. Likewise, a "subdivision" to create a new building site for the same reason and other reasons would be clearly inadvisable.
In Harris v. Pease, 135 Conn. 535, one Doyle in 1921 owned 212 acres. He sold to Plaintiff's predecessor in title 204 acres of which 8 acres were subject to a restriction that no buildings should ever be erected on the 8 acres. Doyle retained land across a dirt road from the 8-acre tract. In 1930 Defendant bought this land. Defendant knew of the restriction and, and because of it, was induced to pay more for the Doyle land than she had first offered. "There is an unusually extensive and picturesque view across the restricted tract from Defendant's property, and the restriction is of great value to her property." (at p. 537) In 1947 Plaintiff bought 51 acres of the 214 owned by Doyle in 1921, including the restricted tract. Plaintiff had actual knowledge of the restriction. Plaintiff was a land developer and proposed to build houses on the 8-acre tract which would interfere with the view from Defendant's property and disturb her peace and quiet. The court held that the restriction ran in perpetuum and was not invalid. It created a property right which was voluntarily created originally, and which was and is of substantial benefit to the Defendant.
Another case also establishes the reasonableness of Defendant Association Board's action. Anderson v. Latimer Point Management Corp., 208 Conn. 256. One Bindloss owned a whole peninsula and leased lots to various individuals, requiring his approval for any proposed construction. "Part of his motive for this requirement was to maximize the water views for all the lessees. (p. 258) Although not perfectly accomplished, CT Page 1968 existing houses are situated on the various lots so as to afford the lessees a view of the water." (p. 259). His approval for alterations on existing structures "would not be unreasonably withheld. With the exception of existing trees, vegetation was not to obstruct the water views of other sublessees." The court made a personal inspection of the property. The court refused to grant Plaintiff an injunction restraining Defendant from interfering with a proposed second story addition to Plaintiff's cottage. The court found the proposed addition would substantially interfere with the water views of the others. (p. 262)
The court, in the present case, having viewed the subject property and areas surrounding it, finds that the construction of a two-story house rising 29 feet above ground level would substantially affect the water views of other property owners adversely and reduce the existing scenic view of the cove and beyond. For this reason and for the several other reasons that the court has elucidated in this memorandum, supported by the history of this case and its subject property, and the information elicited at the public hearing before the Defendant Association Board, the court finds no reason to grant the injunction sought by Plaintiff. The Defendant Association Board has acted reasonably and in good faith in denying approval to build upon Parcel 1a which it finds is not suitable for the purposes sought by Plaintiff and is detrimental to the Defendant Association and its members.
 XI
The restrictive covenants do not call for a public hearing by the Defendant Association's Board in making its decision. Nevertheless, it allowed all parties to present their points of view at such a hearing. It is perhaps of some significance that Plaintiff herself did not speak at the hearing. Whether she was present or not, the court does not know. Only her counsel and various experts spoke for her. One might have thought Plaintiff would have seized the opportunity to speak to her many neighbors in person when she originally had led them to believe she had no intention of building on Parcel 1a and then proceeded to do what she said she would not do.[9]
The Plaintiff must prove irreparable damage to prevail in this case. This she has not done. By her own statements already quoted, she bought Parcel 1a knowing it was not a buildable lot and not intending to build on it. She paid a "cheap price" (her words) for it because it was not usable for building. She was moved to buy it to retain it with an "open view" and to protect her property on the east side of Contentment Island Road. Mrs. Glanville acted from similar CT Page 1969 motives in joining her to make the purchase. The story of Plaintiff's "annexation" has already been told as have her representations to the P Z and to the Defendant Association Board and all the members of the Association. All of this is a far cry from a person acting in good faith, with candor and honesty who buys a lot without restrictions requiring approvals by a community association. Plaintiff knew at all times what her problems were and she has therefore created her own predicament.[10] Plaintiff still owns Parcel 1a in the same condition as when she bought it. It still serves the same purposes for which it was bought. The restrictive covenants on Parcel 1a will expire on January 1, 2000, after which she can build if zoning allows it without the Defendant Association's approval. There may be, however, other reasons why this might not be wise at anytime, e.g. the problems that may arise from the periodic tidal inundations that do occur and their effect on a residential septic system. These could result in creating a public nuisance that might activate litigation against the Plaintiff.
 XII
There remains to be considered the Defendant Association's Counterclaim seeking an injunction restraining Plaintiff from subdividing the subject property or constructing a sewer, cesspool, or drain (other than for surface water). The court's decision to sustain the action of the Defendant Association in denying Plaintiff's request for approval of a subdivision "de-annexing", as it were, Parcel 1a and also what amounted to a denial of Plaintiff's request for approval of Plaintiff's house plans for Parcel 1a settles the issues between the parties. From the court's viewing of the premises, it is apparent that the lot is staked out for the construction of the proposed house. This could mean the Plaintiff intends to proceed with construction notwithstanding the court's decision. There is great danger to Plaintiff if this is done and she takes this risk, as well as causing irreparable harm to the Defendant Association because of the violation of the restrictive covenants. In fact, restrictive covenants may be enforced by injunction without a showing that their violation would cause harm. Hartford Electric Light Co. v. Levitz, 173 Conn. 15, 22. Under the circumstances, it would not be inequitable to enjoin Plaintiff from engaging in the construction of a residence on Parcel 1a, before January 1, 2000. As for enjoining the sale or transfer of Parcel 1a, such sale or transfer cannot be consummated without first obtaining the approval of the Defendant Association's Board. The court presumes that Plaintiff will not act in violation of this provision. If she does, that will be time enough for Defendant to seek an injunction against her. But thus far in this case Plaintiff has CT Page 1970 not sought approval of a sale or transfer and it would be inappropriate at this point for the court to impose injunctive relief against her for something not in issue.
In summary, the court finds the issues for the Defendant on Plaintiff's Complaint, and finds the issues on Defendant's Counterclaim for the Defendant. The court hereby enjoins Plaintiff from engaging in the construction of a residence on Parcel 1a before January 1, 2000. Defendant will present a form of injunction to the court for signature after first submitting it to Plaintiff for approval of the language. If there is any disagreement, it will be submitted to the court which will resolve the matter after a hearing.
THE COURT GEORGE A. SADEN STATE TRIAL REFEREE
FOOTNOTES